

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-11-00228-CV

ACE FIRE UNDERWRITERS                                    APPELLANT
INSURANCE COMPANY

V.

CYNTHIA SIMPKINS,                                         APPELLEE
BENEFICIARY OF RODERICK
SIMPKINS, DECEASED

----------

## FROM THE 67TH DISTRICT COURT OF TARRANT COUNTY

----------

## OPINION

----------

## I. Introduction

Appellant Ace Fire Underwriters Insurance Company (Ace Fire) appeals the trial court's judgment following a jury verdict that Roderick Simpkins suffered a compensable injury that was a producing cause of his death. Ace Fire, the party with the burden of proof in the trial court, contends in six points that the

evidence establishes as a matter of law that the fall leading to Simpkins's death did not originate in or arise out of his employment; that the trial court erred by submitting incorrect and unnecessary questions, definitions, and instructions in the jury charge and by failing to submit additional definitions and instructions; and that the trial court erred by awarding Appellee Cynthia Simpkins attorneys' fees of $200 per hour when the Texas Labor Code and workers' compensation rules allegedly cap attorneys' fees at $150 per hour. We affirm.

## II. Background

Simpkins worked at Coca-Cola Enterprises. He fell at work on September 9, 2005, was admitted to the hospital that day, and died seven days later. Simpkins's surviving spouse, Cynthia, and their daughters filed a claim for workers' compensation benefits. Ace Fire denied the claim, and the dispute proceeded through the workers' compensation hearing process with an appeals panel affirming the hearing officer's decision that Simpkins's death resulted from a compensable injury. Ace Fire appealed the appeals panel decision by filing suit in Tarrant County District Court.

Cynthia, Simpkins's wife of twenty-three years, received a telephone call on September 9, 2005, from a Coca-Cola employee who told her that Simpkins had fallen. Cynthia arrived at the Coca-Cola office before Simpkins was transported by EMS to the hospital. She was also present when Simpkins was admitted to the hospital. She testified that she does not know what caused Simpkins to fall.

2

Cynthia testified that Simpkins was diagnosed with Type 2 diabetes in 1991. Simpkins previously smoked, but he stopped in 1982. His diabetes, although normally controlled by oral medications, diet, and exercise, worsened in 2004, and he began receiving daily insulin injections. Cynthia testified that Simpkins had been diagnosed before September 2005 with high cholesterol, but she was not sure if he had been diagnosed with high blood pressure. She also acknowledged her deposition testimony, during which she had agreed that Simpkins was predisposed to have a stroke or a transient ischemic attack (TIA)[1] because of his diabetes, high blood pressure, high cholesterol, and his weight.[2] However, she testified that she had reviewed Simpkins's medical records from before and after his fall and that the records do not contain any mention of his predisposition to having a stroke or that he had suffered a stroke before he fell.

Melody Sims is a Coca-Cola employee who worked at the same location as Simpkins. She testified that Simpkins's job was to collect money and prepare it for deposit in the bank.

Sims testified that she was at work the day of Simpkins's fall. The jury watched a video recording of Simpkins's fall during Sims's testimony, and Sims

---

[1]A TIA is a form of a stroke that resolves quickly. Unlike a full stroke, the blood clot dissolves and blood flow is restored, usually within the first hour, without damage to the brain.

[2]Cynthia testified that she worked for approximately twenty years as an occupational therapist and that she had evaluated and treated individuals who had suffered strokes, head injuries, and TIAs.

3

described for the jury the office areas and persons visible on the video. Sims testified that there were no chemicals, noxious fumes, or anything else connected to Simpkins's job that would have caused him to fall and that she saw nothing on the floor that would have caused him to slip and fall, trip and fall, or collapse. She admitted, however, that she was focused on Simpkins rather than the floor.[3] Sims also agreed that the floor onto which Simpkins fell is a hard surface, that the floor belongs to Coca-Cola, and that Simpkins was performing his regular job duties at the time he fell.

Mike Edwards witnessed Simpkins's fall. Edwards testified that he was walking through the building toward the cashier's window and that he saw Simpkins, said hello, and asked him how he was doing. Edwards also testified that Simpkins said he was "fine" but that Simpkins then started shaking and grabbed at the door as he fell. Edwards explained, "His eyes rolled back, and he was shaking. And he just was out. . . . He collapsed." Like Sims and the other Coca-Cola employees, Edwards testified that he did not observe anything on the floor before Simpkins's fall that would have caused him to slip or trip and that there were no chemicals or anything else connected to Simpkins's job that would have caused him to fall.

---

[3]Two other Coca-Cola employees testified that they did not observe anything on the floor that would have caused Simpkins to slip or trip and that there were no chemicals or anything else connected to Simpkins's job that would have caused him to fall.

On cross-examination, Edwards acknowledged that his written statement, prepared shortly after the incident, does not mention that Simpkins's eyes rolled back in his head or that he was shaking before he fell. Edwards also agreed that Simpkins was performing his job duties at the time he fell but testified that he does not believe that Simpkins's job caused his fall. Edwards, although he acknowledged that he has no medical training, also testified that Simpkins was unconscious before his head hit the floor.

Dr. Roberto Nieto, a board-certified neurologist, testified as an expert for Ace Fire. He testified that a stroke occurs when a blood clot travels to the brain, becomes lodged in an artery, and cannot pass any further. If the blockage is not relieved, permanent brain damage will result. Dr. Nieto testified that a TIA is a form of a stroke that resolves quickly. Dr. Nieto explained that, with a TIA, there is not "any hard evidence of any damage to the brain," so a TIA diagnosis is made by looking at the patient's medical history for risk factors and the event itself for the patient's symptoms. Dr. Nieto testified that Simpkins was at risk for having a stroke because of his age, high blood pressure, diabetes, history of smoking, and elevated cholesterol. Simpkins was also in the "high risk factor category" for having a heart attack.

Describing what he observed on the videotape of Simpkins's fall, Dr. Nieto testified that he does not know whether Simpkins lost consciousness or not but that he collapsed with a "sudden loss of postural tone," meaning that he lost the ability to keep his body in a vertical position. From his review of the hospital

5

records, Dr. Nieto testified that Simpkins sustained skull fractures from hitting his head on the floor of Coca-Cola's premises and that the autopsy report lists Simpkins's cause of death as a skull fracture.

Dr. Nieto testified that the hospital intake notes indicate that Simpkins had left facial droop and that his left leg and left arm were paralyzed, symptoms consistent with Simpkins having suffered a stroke. He also agreed, however, that facial droop and paralysis can result from pressure to the brain, that the pressure could come from bleeding inside the skull, and that Simpkins's skull fracture caused him to bleed to the extent that the neurosurgeon had to relieve the resulting pressure. Dr. Nieto testified that he agreed with the pathology report from Simpkins's autopsy that Simpkins did not suffer a massive stroke and that Simpkins indeed died from his head injuries, but he testified that he also felt "that something additional happened just prior to his collapse." Specifically as to Simpkins's cause of death, Dr. Nieto testified that he agreed with Dr. Krouse's findings.

Dr. Nieto listed numerous conditions, including an irregular heart rhythm, a TIA, a stroke, and a pulmonary embolism, that could have caused Simpkins's fall, and he testified that he "definitely believe[d] that something happened to [Simpkins] that day in his body that caused him to collapse and not brace his fall." Dr. Nieto testified that "clearly[,] something related to his heart or brain or other organ may have -- or likely occurred at that point that caused him to collapse." But Dr. Nieto also testified that he could not determine whether

6

Simpkins had suffered a stroke, a pulmonary embolism, or any other condition. Regardless, Dr. Nieto testified:

Q. So in -- in your opinion, did anything in connection with Mr. Simpkins' job at Coca-Cola cause him to fall?

A. No.

Q. Do you have an opinion as to whether or not anything at his job, at Mr. Simpkins' job caused him to fall?

A. I don't --

Q. You can answer.

A. I don't see any -- anything that caused him to fall at work.

Dr. Marc Krouse, the Chief Deputy Medical Examiner in Fort Worth who conducted the autopsy in this case, testified as an expert for Appellee. Dr. Krouse conducted the autopsy on September 17, 2005, and dictated the autopsy report on October 28, 2005. As part of that process, he reviewed the investigator's report, information about how Simpkins was injured, and the videotape of Simpkins's fall.

Dr. Krouse described the autopsy process to the jury and testified that he found an abrasion, one-inch by one-half-inch, on the back of Simpkins's head near the center as well as a bruise in the soft tissue under his scalp. Dr. Krouse also described the injuries to Simpkins's brain, including bruises to the front and side of the right temporal lobe and death of brain tissue caused by interruption of blood flow. He testified that bleeding on the brain is a sign of tissue death, and any bleeding on the brain is dangerous. The bleeding causes pressure which

7

can affect the person's motor skills and speech, and Dr. Krouse testified that facial droop and paralysis is consistent with traumatic brain injury with bleeding on the brain.

Dr. Krouse testified that the cause of Simpkins's death was blunt force trauma to the head due to a fall. He also testified that he did not find any evidence of a stroke or other tissue damage that was not caused by the primary traumatic injury from the fall. Dr. Krouse listed the external symptoms exhibited by persons who have suffered a myocardial infarction, including pain in the chest, pain radiating into an arm, shortness of breath, chest tightness, and clamminess of the skin, and he testified that the MedStar records state that Simpkins did not exhibit these symptoms.

On cross-examination, Dr. Krouse agreed that he was not giving an opinion as to what caused Simpkins's fall. He also agreed that the type of event that Simpkins experienced can occur at places other than a person's work and that there is no evidence that Simpkins tripped or hit his head on a sharp object. Dr. Krouse acknowledged that, from his review of the videotape, it is possible that Simpkins experienced dizziness or unconsciousness before falling. He also agreed that it is possible that Simpkins had a TIA that caused him to fall but that there would not be evidence of the TIA on a CT scan, on an MRI, or during the autopsy. Dr. Krouse also acknowledged that Simpkins was at twice the risk of the ordinary public for having a stroke or TIA.

Dr. Krouse testified that he did not examine Simpkins's heart, arteries, pancreas, liver, or lungs during the autopsy and that an embolism in another part of Simpkins's body could have caused him to fall. But he also testified that nothing in another part of Simpkins's body would have changed his opinion about Simpkins's cause of death. Dr. Krouse testified that left-sided facial droop and paralysis could indicate that Simpkins had a stroke and that although a stroke is a possibility and would have been in his differential diagnosis upon presentation to the hospital, he did not believe it likely in this case. However, Dr. Krouse also testified as follows:

> Q. You're not telling the jury or the judge in this case that Mr. Simpkins' job or his job duties caused him to pass out and fall, are you?
>
> A. No.
>
> Q. And you're not telling the ladies and gentlemen of the jury that Mr. Simpkins' fall originated in his job duties or arose out of his job, are you?
>
> A. No.

Finally, Dr. Krouse agreed that he does not know what initiated Simpkins's fall and that he only knows the result.

### III. Legally Sufficient Evidence

Ace Fire argues in its first point that the evidence establishes as a matter of law that Simpkins's fall did not originate in or arise out of his employment because there was no evidence of a causal connection between his fall and his employment.

9

## A. Standard of Review

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960). In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005). If a party is attacking the legal sufficiency of an adverse finding on an issue on which the party had the burden of proof, and there is no evidence to support the finding, we review all the evidence to determine whether the contrary proposition is established as a matter of law. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001); *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989). As the party appealing the agency decision to award death benefits to Appellee, Ace Fire bore the burden of proof by a preponderance of the

evidence at the trial in district court. Tex. Lab. Code Ann. § 410.303 (West 2006).

## B. Discussion

The labor code defines "compensable injury" as "an injury that arises out of and in the course and scope of employment for which compensation is payable" under the Texas Workers' Compensation Act (the Act). Tex. Lab. Code Ann. § 401.011(10) (West Supp. 2012). Ace Fire does not contest that Simpkins was in the course and scope of his employment at the time of the fall. Rather, Ace Fire argues that Simpkins's fall did not originate in or arise out of his employment because his employment did not put him in a position that increased his risk of injury. Ace Fire points to evidence that nothing at Coca-Cola's premises, such as a substance on the floor or a noxious chemical, caused Simpkins to fall. Ace Fire also cites Dr. Nieto's testimony that there was something going on inside Simpkins's body that caused him to fall and that Simpkins's fall was not caused by his employment.[4]

Ace Fire refers us to *Fort Worth State School v. Jones*, 756 S.W.2d 445, 446–47 (Tex. App.—Fort Worth 1988, no writ). In that case, Jones suffered a cerebral hemorrhage while at work. *Id.* at 446. Jones presented evidence at trial

---

[4]Ace Fire also states that "Dr. Krouse admitted that Mr. Simpkins' fall and resulting injuries were <u>not</u> caused by nor did they originate in his employment." To support this statement, Ace Fire relies on the portion of Dr. Krouse's cross-examination that is quoted above. While Dr. Krouse did not testify that Simpkins's employment caused his fall, we do not read Dr. Krouse's testimony as an admission that Simpkins's fall was not caused by his employment.

11

that she fell on the job and that the fall caused her hemorrhage. *Id.* The state school countered with evidence that Jones suffered from preexisting hypertension and that her hypertension, not a blow to the head, caused the hemorrhage. *Id.* After the jury returned a verdict that included a finding that Jones was not injured in the scope of her employment, the trial court disregarded the jury finding and entered judgment for Jones. *Id.* This court reversed and rendered judgment in accordance with the jury's verdict, holding that the testimony by the state school's expert witness "constituted some evidence that Jones'[s] injury was not in the course of her employment." *Id.* at 447. Although Ace Fire argues that we held in *Jones* that Jones was not injured in the course and scope of her employment, we did not do so. Rather, we held that the trial court erred by disregarding the jury's finding that Jones was not injured in the scope of her employment because there was "some evidence" to support the jury's finding on the disputed fact issue. *See id.* We rendered judgment because the jury had already resolved the disputed fact issue when it reached its verdict. *See id.*

Ace Fire also relies on *Employers' Casualty Company v. Bratcher*, 823 S.W.2d 719 (Tex. App.—El Paso 1992, writ denied). There, Bratcher collapsed in the lavatory of a work-site trailer, and coworkers were unable to resuscitate him. *Id.* at 719–20. The summary judgment evidence included an expert witness affidavit that stated that Bratcher died from a ruptured berry aneurysm in his brain and that "the most likely precipitating cause for rupture of the aneurysm

12

was straining during defecation." *Id.* at 720. The trial court granted summary judgment for Bratcher's widow and minor son and denied the carrier's motion for summary judgment. *Id.* at 720. The appellate court applied the "positional risk" or "but for" test, which it described as "focus[ing] the court's inquiry upon whether the injury would have occurred if the conditions and obligations of employment had not placed the claimant in harm's way." *Id.* at 721 (citing *Walters v. Am. States Ins. Co.*, 654 S.W.2d 423, 426 (Tex. 1983), and *N. River Ins. Co. v. Purdy*, 733 S.W.2d 630, 633 (Tex. App.—San Antonio 1987, no writ)). Holding that the trial court should have granted the carrier's motion for summary judgment, the court explained,

> [Mr. Bratcher's] aneurysm could have burst at any time. The injury did not arise but for him being at work, rather it was due to a personal defect which proved to be fatal from a strain totally unrelated to the deceased's employment. It cannot be said that but for Mr. Bratcher being assigned to a rig as a toolpusher he would not have gone to the bathroom on the occasion in question. Instead the risk was one Mr. Bratcher would have confronted irrespective of any type of employment.

*Id.* at 722. Relying on *Bratcher* and *Jones*, Ace Fire argues that the evidence is legally insufficient because there is no evidence that Simpkins's fall and resulting injury arose out of his employment.

Appellee responds that more than a scintilla of evidence supports the jury's finding that Simpkins suffered a compensable injury that was a producing cause of his death, and she primarily relies on four cases. *See Tex. Emp'rs Ins. Ass'n v. Page*, 553 S.W.2d 98, 102 (Tex. 1977); *Garcia v. Tex. Indem. Ins. Co.*, 146

13

Tex. 413, 419, 209 S.W.2d 333, 337 (1948); *Dir., State Emps. Workers' Comp. Div. v. Bush*, 667 S.W.2d 559, 561–62 (Tex. App.—Dallas 1983, no writ); *Gen. Ins. Corp. v. Wickersham*, 235 S.W.2d 215, 219 (Tex. Civ. App.—Fort Worth 1950, writ ref'd n.r.e.).

In *Garcia*, Garcia had an epileptic seizure while standing on a loading dock at work. 146 Tex. at 414–16, 209 S.W.2d at 334–35. Because of the seizure, Garcia fell to the sidewalk, and the evidence reflected that Garcia likely hit his head on a post while falling. *Id.* at 415, 209 S.W.2d at 334. The jury found that Garcia had sustained an injury in the course and scope of his employment, but the trial court disregarded the jury's verdict and rendered judgment for the carrier. *Id.* at 415–16, 209 S.W.2d at 334–35. The intermediate appellate court affirmed. *Id.* at 414, 209 S.W.2d at 333. The supreme court framed the issue as follows: "Since Garcia's fall was due to his epilepsy[,] did his injury arise out of his employment? In other words, was there a causal connection between the conditions under which his work was required to be performed and his resulting injury[?]" *Id.* at 416, 209 S.W.2d at 335. As part of its holding that Garcia's injuries arose out of his employment because they were causally connected to his employment, the court stated that the only reasonable conclusion to be made from the evidence was that Garcia struck his head on a sharp corner as he fell to the ground. *Id.* at 418–19, 209 S.W.2d at 336. The court continued,

> The post with the sharp corners, which resulted from measures taken to protect the post, was a condition attached to the place of Garcia's employment; more than that, it was an instrumentality

14

essential to the work he was waiting to do. Since his duties required him to be near the post at that time, the danger of falling against it was a hazard to which he was exposed because of his employment; and injury and death from a crushed temple suffered when he did fall against it came to him because he was then acting in the course of his employment and under the conditions of his employment. If he had not been working he might have suffered the epileptic stroke anyhow and he might have fallen just as he did fall, but he certainly would not have fallen against this post with its sharp edges to fracture his temple and die. Danger of injury from a fall at some other place might have been no less, but it certainly was not the same.

*Id.* at 419, 209 S.W.2d at 337 (citations omitted).

In *Page*, the supreme court held that the evidence "presented a fact issue of whether the injury originated out of Page's employment, that is whether there was a sufficient causal connection between the conditions under which his work was required to be performed and his resulting injury." 553 S.W.2d at 102. Page was working as a bank security guard and was walking across the bank parking lot when his knee "buckled." *Id.* at 99. Page eventually underwent a knee implant operation after initial treatment attempts failed. *Id.* The trial court granted the carrier's motion for directed verdict, but the intermediate appellate court reversed and remanded for a new trial. *Id.* The carrier sought review by the supreme court. *Id.*

The evidence at trial reflected that Page had injured his knee three years earlier, but the supreme court held that the evidence did not support a conclusion that Page's preexisting injury was the sole cause of his fall. *Id.* at 100. The carrier also argued that Page's injury was not compensable because idiopathic

15

falls to level ground are not compensable. *Id.* However, the court held that "a fall due to an idiopathic origin will not necessarily preclude recovery" and that a fact issue remained as to whether Page's injury "originated out of [his] employment." *Id.* at 102. Thus, the court remanded for a new trial. *Id.*

In *Wickersham*, this court held that sufficient evidence supported the trial court's judgment awarding death benefits. *See* 235 S.W.2d at 219. Wickersham was a restaurant janitor, and the evidence reflected that he fell at his employer's premises, striking his head and causing fatal injuries. *Id.* at 217. We assumed for purposes of our opinion that Wickersham's fall was caused by a dizzy spell, and we noted the trial court's findings of fact that Wickersham's head "certainly struck the tile floor," that his head may have struck a door hinge or cigar counter, that he suffered a fractured skull from the blow to one of those objects, and that the fracture caused his death. *Id.* After considering cases from other jurisdictions, we stated, "We can find no sound reason for denying a recovery where the fall is to the floor, when recovery is allowed where the fall is from a ladder, or platform or similar place, or into a hole, or against some object such as a table, machine, or post." *Id.* at 219.

The Dallas Court of Appeals held in *Bush* that sufficient evidence supported the jury's finding that Bush was injured in the course and scope of her employment. *See* 667 S.W.2d at 562. Bush, a food service worker at Terrell State Hospital, felt faint, was placed on a stretcher, and was taken to the emergency dock. *Id.* at 560. At the emergency dock, a set of the stretcher's

16

wheels failed to lock, and Bush fell toward the ground, injuring her head and neck. *Id.* at 560–61. The parties agreed that high blood pressure was the underlying cause of Bush's fainting and that the fall on the stretcher was the source of the injury to her head and neck. *Id.* at 561. The State argued on appeal that "because no evidence was presented to connect the fainting to any conditions of the work place, the fall from the stretcher was not within the scope and course of employment." *Id.*

The court reviewed the *Page*, *Garcia*, and *Wickersham* cases and stated that "if Bush had fallen at the time of her initial fainting and had been injured by hitting the floor or any other instrumentality of her employer's business, her injury would clearly lie within the criteria of *Garcia* and its progeny." *Id.* But the court noted that Bush's situation differed because her high blood pressure caused her to be on the stretcher but did not directly cause her injury. *Id.* at 561–62. Even so, the court held that Bush did not leave the course and scope of her employment by accepting medical assistance from her employer and that "a defective instrumentality of Bush's employer (the stretcher) caused the accident and resulting injuries to her head and neck for which compensation [was] sought." *Id.* at 562. The court thus held that sufficient evidence supported the jury's determination that Bush was injured in the course and scope of her employment. *Id.*

The evidence in this case lies somewhere between that in *Bratcher*, which involved a noncompensable death from a ruptured aneurysm, and that in

17

*Wickersham*, which involved a compensable death from an unexplained fall and fatal blow to the head. *See Bratcher*, 823 S.W.2d at 722; *Wickersham*, 235 S.W.2d at 219. But we need not choose between *Bratcher* and *Wickersham* because Ace Fire's first point fails in light of the procedural posture of this case and the applicable standard of review on appeal. As the party appealing the administrative decision to award death benefits, Ace Fire bore the burden of proving by a preponderance of the evidence at trial that Simpkins did not suffer a compensable injury. Tex. Lab. Code Ann. § 410.303. Moreover, because Ace Fire is challenging an adverse finding on an issue for which it had the burden of proof, we "first examine the record for evidence that supports the finding, while ignoring all evidence to the contrary." *Francis*, 46 S.W.3d at 241; *see Sterner*, 767 S.W.2d at 690. Only then do we review the record to determine whether Ace Fire proved as a matter of law that Simpkins did not suffer a compensable injury. *See Francis*, 46 S.W.3d at 241; *Sterner*, 767 S.W.2d at 690.

Reviewing the record for evidence favorable to the jury's finding that Simpkins suffered a compensable injury that was a producing cause of his death, we note that there is evidence that Simpkins was performing his regular job duties at the time of his fall, that the floor on which he hit his head was at Coca-Cola's premises and was an instrumentality of his employer, that Simpkins suffered a skull fracture from striking his head on the floor, and that the skull fracture caused his death. Comparing this evidence to that which we held to be legally sufficient in *Wickersham* and to that which our sister court stated would be

18

sufficient in *Bush*, we hold that there is more than a scintilla of evidence to support the jury's finding that Simpkins's death arose out of his employment. *See Bush*, 667 S.W.2d at 561; *Wickersham*, 235 S.W.2d at 217, 219.

Moreover, we hold that Ace Fire, as the party with the burden of proof, did not conclusively establish that Simpkins's fall and resulting injury did not arise out of his employment. Ace Fire certainly presented evidence that nothing in connection with Simpkins's employment caused him to fall, but its medical expert was unable to identify why Simpkins fell. Instead, Dr. Nieto testified that "something related to [Simpkins's] heart or brain or other organ may have -- or likely occurred at that point that caused him to collapse" but that he could not determine whether Simpkins had suffered a stroke, a pulmonary embolism, or any other condition. And it is undisputed that Simpkins's death was caused by the skull fracture sustained as a result of blunt force trauma to the head. *See Page*, 553 S.W.2d at 102 (stating that "a fall due to an idiopathic origin will not necessarily preclude recovery" and holding that there was a fact issue as to whether Page's injury following a level-surface fall originated out of his employment). Ace Fire's evidence thus fell short of the summary judgment evidence presented in *Bratcher*, a case in which the medical experts agreed that the employee's death was caused by a ruptured aneurysm. *See* 823 S.W.2d 719, 721–22. Here, Simpkins's death was caused by the blow to his head upon falling onto Coca-Cola's floor, a fact not in dispute between the testifying experts.

This is unquestionably a close case, but considering the evidence favorable to the finding if a reasonable factfinder could and disregarding evidence contrary to the finding unless a reasonable factfinder could not, we hold that legally sufficient evidence supports the jury's determination that Simpkins's death arose out of his employment. *See Cent. Ready Mix Concrete Co.*, 228 S.W.3d at 651; *City of Keller*, 168 S.W.3d at 807, 827; *see also Wickersham*, 235 S.W.2d at 217, 219. We therefore overrule Ace Fire's first point.

## IV. Producing Cause in the Jury Charge

Ace Fire complains in its second and third points that the trial court should not have submitted a producing cause definition in the jury charge and that the submitted producing cause definition was legally incorrect.

The court's charge included the following question and definition:

> Do you find by a preponderance of the evidence that Roderick Simpkins <u>did not</u> suffer a compensable injury on September 9, 2005, that was a producing cause of his death?

> "Producing cause" means an efficient, exciting, or contributing cause that, in a natural sequence, produces the death in question. There may be more than one producing cause.

## A. Submitting Producing Cause

Ace Fire argues in its second point that the trial court erred by submitting a producing cause definition and instruction in the jury charge because producing cause was not at issue before the appeals panel or as part of Ace Fire's appeal to district court. "We review a trial court's decision to submit or refuse a particular instruction under an abuse of discretion standard of review." *In re*

20

*V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000) (citing *La.–Pac. Corp. v. Knighten*, 976 S.W.2d 674, 676 (Tex. 1998)). "The trial court has considerable discretion to determine necessary and proper jury instructions." *Id.*

Ace Fire relies on *Texas Workers' Compensation Insurance Fund v. Mandlbauer*, 34 S.W.3d 909, 912 (Tex. 2000) (per curiam) (op. on reh'g), a case in which the supreme court held that the injured employee was not entitled to submission of an instruction on producing cause. *Mandlbauer* is distinguishable because it concerned the failure to submit additional instructions concerning producing cause (as opposed to the improper submission of an unnecessary instruction) and because the factual dispute was whether a compensable back injury extended to further injuries that manifested at a later date. *Id.* at 910–12. Even so, we agree that it was not necessary for the trial court to submit producing cause to the jury in this case, but we do so for a different reason.

When facts are undisputed or conclusively established, there is no need to submit those issues to the jury. *Sullivan v. Barnett*, 471 S.W.2d 39, 44 (Tex. 1971); *see XCO Prod. Co. v. Jamison*, 194 S.W.3d 622, 633 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) (op. on reh'g). Here, there was no dispute that Simpkins's fall was a producing cause of his death. Both experts agreed that he died from a skull fracture sustained as a result of blunt force trauma to his head. Instead, the dispute centered on the issue of whether Simpkins's death resulted from a compensable injury, and the trial court instructed the jury in relevant part that a "compensable injury" is one that "arose

21

out of [Simpkins's] employment."  As discussed above, Ace Fire argued and presented evidence that nothing connected with Simpkins's employment caused him to fall, meaning that his injury and resulting death did not arise out of his employment.  But Ace Fire did not contest whether Simpkins's death was caused by the blunt force trauma to his head, and Ace Fire's expert readily agreed with the medical examiner's opinion concerning Simpkins's cause of death.  Thus, because whether the fall was a producing cause of Simpkins's death was not in dispute at trial, it was unnecessary for the trial court to submit it to the jury.  *See Sullivan*, 471 S.W.2d at 44; *XCO Prod. Co.*, 194 S.W.3d at 633; *Trice v. State*, 712 S.W.2d 842, 850 (Tex. App.—Waco 1986, writ ref'd n.r.e.).

Ace Fire argues that the inclusion of producing cause was harmful because it required Ace Fire "to, in essence, negate a producing cause issue which was not an issue before the [appeals panel]."  But Ace Fire did not attempt to negate producing cause at trial and instead sponsored an expert witness who concurred with the medical examiner's cause of death opinion.  The remainder of Ace Fire's evidence was designed to convince the jury that Simpkins's fall did not result in a compensable injury because the fall did not arise out of his employment, and Ace Fire would have prevailed in the trial court if it had convinced the jury of its position.  The trial court's unnecessary inclusion of producing cause did not create a higher or more onerous burden for Ace Fire because producing cause was superfluous language concerning an undisputed

fact.  *See Trice*, 712 S.W.2d at 850 ("[T]he submission of undisputed facts does not ordinarily result in reversible error.").

"Charge error is generally considered harmful if it relates to a contested, critical issue."  *Transcon. Ins. Co. v. Crump*, 330 S.W.3d 211, 225 (Tex. 2010) (quoting *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 856 (Tex. 2009)).  Unless the appellate court is reasonably certain that the jury was not significantly influenced by issues erroneously submitted to it, the error is reversible.  *Romero v. KPH Consol., Inc.*, 166 S.W.3d 212, 227–28 (Tex. 2005).  However, because producing cause was not disputed in this case, its inclusion in the charge was harmless.  *See Trice*, 712 S.W.2d at 850; *see also* Tex. R. App. P. 44.1(a)(1) (defining reversible error to include an error that "probably caused the rendition of an improper judgment"); *Steel v. Wheeler*, 993 S.W.2d 376, 381 (Tex. App.—Tyler 1999, pet. denied) (holding failure to submit question and instruction harmless because evidence on the point was conclusive).  We therefore overrule Ace Fire's second point.

## B.  Incorrect Producing Cause Jury Instruction

Ace Fire contends in its third point that the trial court erred by submitting an incorrect definition of "producing cause" in the jury charge.  Assuming without deciding that Ace Fire preserved this point for appeal, we hold that although the trial court submitted a legally incorrect definition of producing cause in the jury charge, the trial court's error was harmless.

23

After the trial in this case, the supreme court issued an opinion disapproving of a producing cause definition identical to the definition submitted by the trial court in this case. *See Crump*, 330 S.W.3d at 220, 223–25. The court held that "producing cause in workers' compensation cases is defined as a substantial factor in bringing about an injury or death, and without which the injury or death would not have occurred." *Id.* at 223. The producing cause definition in this case did not include the "without which" language and was therefore incorrect. *Id.* at 223–26; *see Cont'l Cas. Co. v. Baker*, 355 S.W.3d 375, 386 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (op. on reh'g).

The incorrect definition was not, however, harmful error because producing cause was not contested in this case. *See Steel*, 993 S.W.2d at 381; *Trice*, 712 S.W.2d at 850. This case is therefore distinguishable from two recent opinions in which it was held that a legally incorrect definition of producing cause required reversal for a new trial. *See Crump*, 330 S.W.3d at 226; *Baker*, 355 S.W.3d at 383–87.

In *Crump*, the evidence reflected that Crump struck his knee while at work, that the injury caused a contusion and hematoma, that increasingly serious complications arose, and that Crump died about eight months after his initial injury. 330 S.W.3d at 214. The knee injury was determined to be a compensable injury, but the dispute centered on whether the knee injury was a producing cause of Crump's death eight months later. *Id.* Producing cause was the only issue that the trial court submitted to the jury in that case. *Id.* at 215.

24

Holding that the incorrect definition of producing cause was harmful, the supreme court stated, "The but-for aspect of causation was squarely at issue in this case, and the sole question before the jury was whether the May 2000 injury was a producing cause of Crump's death." *Id.* at 226.

The *Baker* court also held that an incorrect producing cause definition was harmful. 355 S.W.3d at 386–87. The evidence showed that Baker injured his knee in July 2000 when stepping off a ladder, that the carrier accepted the claim, but that the carrier later disputed whether Baker's original knee injury included a medial meniscus tear that was first identified five years later. *Id.* at 377. Explaining that the incorrect definition required reversal for a new trial, the court held,

> As in *Crump*, the 'but-for' or 'substantial factor' aspect of causation was squarely at issue, and the charge error related to the sole issue in the case, that of causation. Also as in *Crump*, the evidence in this case included conflicting expert testimony regarding whether the accident caused the meniscus tear, which was the sole question before the jury.

*Id.* at 386 (citations omitted).

The evidence in this case is different because the parties disputed whether Simpkins's injury arose out of his employment, not whether the blow to his head caused his death. Ace Fire attempted to prove that Simpkins could have fallen anywhere because something happened to his body that caused him to fall, but it did not dispute that Simpkins died from the traumatic head injury. Moreover, Ace Fire argued in its second point that producing cause should not have been

25

included in the jury charge at all because it was not at issue in the case. Thus, because the trial court's charge error did not relate to a disputed factor in the case and instead involved an issue of undisputed fact, we cannot say that the trial court's error probably caused the rendition of an improper verdict because we are reasonably certain that the jury was not significantly influenced by the trial court's erroneous instruction. *See Romero*, 166 S.W.3d at 227–28 (reciting standard of review); *see also Steel*, 993 S.W.2d at 381; *Trice*, 712 S.W.2d at 850. We therefore overrule Ace Fire's third point.

## V. Failure to Submit Additional Instructions and Definitions

Ace Fire argues in its fourth point that the trial court abused its discretion by failing to submit additional instructions and definitions concerning course and scope of employment and compensable injury because those definitions and instructions "are more closely aligned to the evidence produced at trial." Although Ace Fire does not cite any authority that would have required the trial court to submit the additional instructions and definitions under the circumstances of this case, we note that the trial court refused to submit some of Ace Fire's proposed instructions and definitions because it was concerned that doing so would comment on the weight of the evidence by highlighting Dr. Nieto's testimony. The trial court also refused an instruction that an injury does not include ordinary diseases of life because the proposed instruction came from part of the definition of "occupational diseases" and because occupational diseases are not at issue in this case. *See* Tex. Lab. Code Ann. § 401.011(34) (West

26

Supp. 2012). From the explanations provided by the trial court on the record at the charge conference, we cannot say that the trial court abused its discretion by failing to submit these definitions and instructions. *See Crowson v. Bowen*, 320 S.W.3d 486, 488 (Tex. App.—Fort Worth 2010, no pet.) ("We review claimed error in the jury charge under an abuse of discretion standard."). To the extent Ace Fire complains of other proposed definitions and instructions, it has not identified them in its brief, explained why it was entitled to their submission, or described why the failure to submit them was reversible error. We thus overrule Ace Fire's fourth point.

## VI. Alleged Improper Burden of Proof

Ace Fire contends in part of its fifth point that the trial court erred by submitting Question No. 1 to the jury because there was no evidence or legally insufficient evidence to support the submission. We overrule this part of Ace Fire's fifth point for the same reasons that we overruled its first point.

In the remainder of its fifth point, Ace Fire argues that Question No. 1, as submitted, imposed an improper burden of proof on Ace Fire and constituted a comment on the weight of the evidence because it required Ace Fire to prove a negative. The court's charge asked the jury to answer "yes" or "no" to the following question: "Do you find by a preponderance of the evidence that Roderick Simpkins did not suffer a compensable injury on September 9, 2005, that was a producing cause of his death?" The jury answered "no," meaning that

it found that Simpkins "did suffer a compensable injury on September 9, 2005, that was a producing cause of his death."

Although Ace Fire contends that the trial court's phrasing of Question No. 1 was in error, it does not cite any authority to support its position outside of a statement from an easily distinguishable dram shop liability case that states that "proving a negative is always difficult and frequently impossible." *20801, Inc. v. Parker*, 249 S.W.3d 392, 397 (Tex. 2008) (quoting *State Farm Mut. Auto. Ins. Co. v. Matlock*, 462 S.W.2d 277, 278 (Tex. 1970)). Moreover, because Ace Fire was the party appealing the adverse decision by the appeals panel, the procedural posture of this case required that Ace Fire prove by a preponderance of the evidence that Simpkins did not suffer a compensable injury that was a producing cause of his death. *See* Tex. Lab. Code Ann. § 410.303; *Crump*, 330 S.W.3d at 226 ("Transcontinental bore the burden of proving, by a preponderance of the evidence, the negative proposition that the May 2000 injury was not a producing cause of Crump's death."). We also note that the trial court included two instructions along with Question No. 1 that advised the jury to answer "Yes" if it found that "Simpkins did not suffer a compensable injury on September 9, 2005, that was a producing cause of his death" or to answer "No" if it found that "Simpkins did suffer a compensable injury on September 9, 2005, that was a producing cause of his death." Thus, we cannot say that the trial court abused its discretion by submitting Question No. 1 as phrased, and we overrule the remainder of Ace Fire's fifth point.

## VII.  Attorney's Fees

Ace Fire argues in its sixth point that the trial court erred by awarding attorney fees to Appellee at an hourly rate in excess of $150 per hour.  However, in response to an identical argument, this court held just last year that commission rules capping attorney's fees at $150 per hour do not apply when the carrier unsuccessfully appeals the appeals panel decision to district court and fees are awarded to the claimant pursuant to labor code section 408.221(c).  *See Cont'l Cas. Ins. Co. v. Lavender*, No. 02-10-00399-CV, 2011 WL 2306832, at *3 (Tex. App.—Fort Worth June 9, 2011, pet. denied) (mem. op.).  "The commissioner's guidelines for maximum attorney's fees are applicable only to legal fees generated by proceedings before the commission."  *Id.* (citing 28 Tex. Admin. Code § 152.4(a) (2011) (last amended 1994) (Tex. Dep't of Ins., Div. of Workers' Comp.).  We thus overrule Ace Fire's sixth point.

## VIII.  Conclusion

Having overruled each of Ace Fire's points, we affirm the trial court's judgment.

ANNE GARDNER
JUSTICE

PANEL:  LIVINGSTON, C.J.; GARDNER and GABRIEL, JJ.

DELIVERED:  August 30, 2012