

# COURT OF APPEALS

**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

## NO. 02-16-00031-CV

LESLEY BELL, INDIVIDUALLY AND          APPELLANT
ON BEHALF OF THE ESTATE OF
SAM BELL

V.

ROY GILFOUR          APPELLEE

----------

FROM THE 153RD DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 153-265549-13

----------

## MEMORANDUM OPINION[1]

----------

In three issues, Appellant Lesley Bell, individually and on behalf of Sam

Bell, appeals from the trial court's take-nothing judgment entered in this wrongful

death case. We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

## I. BACKGROUND

Lesley Bell and Joanna Dobbs were married in 1995 and had a son, Sam Bell. The three lived in Colorado for a few years before moving to Montana. Lesley and Joanna divorced in 2003 but continued to live together in Montana with Sam until Joanna became involved with, and then married, Peter Dobbs. Peter, Joanna, and Sam ultimately moved to Fort Worth. Jamie Abrams lived a couple of houses down from Joanna's new house in Fort Worth, and she also had a son, Ethan Abrams, who was one year younger than Sam. When Joanna was mowing her lawn one day, Jamie decided to introduce herself to Joanna. Joanna and Jamie became instant friends, as did Sam and Ethan. Peter was a truck driver whose job required him to travel extensively, and when he was out of town, Joanna's sister, Dolly Anderson, would often travel to Fort Worth to stay with Joanna and Sam. As a result of these circumstances, Joanna, Sam, Dolly, Jamie, and Ethan would often get together for dinner, sometimes at Joanna's house and sometimes at Jamie's.

Joanna and Sam met Appellee Roy Gilfour in the summer of 2011 when he came to a garage sale Joanna and Peter held at their Fort Worth home. After the garage sale, Joanna, Sam, and Gilfour began to socialize together, and eventually Gilfour met Dolly when she was on one of her visits to see Joanna and Sam. Joanna, Sam, Dolly, and Gilfour frequently got together for dinner. And when Joanna hosted dinner at her house for Sam, Dolly, Jamie, and Ethan, Gilfour would often join them. Pertinent to this case, over time, Gilfour and Sam

in particular became very close. When Gilfour came over to Joanna and Sam's house, he and Sam would talk a lot. Gilfour occasionally gave Sam gifts, such as a football, a knife, and a pool stick. Gilfour also took Sam to play pool with the pool stick he had given Sam. Sam liked being around Gilfour and looked up to him. And according to Gilfour, Sam constantly asked Gilfour to get him a handgun.

On February 22, 2012, Joanna hosted dinner at her home for Sam, Dolly, Jamie, Ethan, and Gilfour as she had done many times before. Gilfour was the last to arrive, and he brought with him a gift for Sam: an unloaded .22 caliber revolver. Sam was given possession of the revolver, although there is some dispute over exactly how it happened, who was present when it did, and whether Joanna consented.

Sometime later, Gilfour found Sam and Ethan in the garage, and Sam had the revolver in his hand. Gilfour saw that some .22 caliber long bullets had been loaded in the revolver's cylinder.[2] Gilfour told Sam that the .22 caliber long bullets were the wrong kind of ammunition for the revolver and that only .22 caliber short bullets would fit in it.[3] Gilfour then walked out of the garage and back into the house, leaving Sam and Ethan behind. Joanna, Dolly, and Jamie

---

[2]Gilfour testified that there are different kinds of .22 caliber ammunition—a .22 caliber short bullet, designed for use in a revolver like the one he had given Sam, and a .22 caliber long bullet, designed for use in a rifle.

[3]Gilfour testified that he did not believe that the revolver would "function properly" with .22 caliber long ammunition.

3

were still inside the house, but Gilfour did not tell them what had just transpired in the garage. Sam and Ethan eventually came back inside the house, and Jamie, Ethan, and Gilfour left later that evening. That night, when Sam was in bed, he shot himself in the head with the revolver, an injury from which he later died. The bullet that had discharged from the revolver was a .22 caliber long bullet.

Lesley sued Gilfour for wrongful death, alleging negligence and negligence per se claims against him. The case was tried to a jury, which returned a verdict finding no negligence on the part of Gilfour. Lesley appeals.

## II. THE TRIAL COURT'S BROAD-FORM NEGLIGENCE-PER-SE LIABILITY JURY QUESTION

In his first issue, Lesley contends that the trial court erred by submitting to the jury one broad-form negligence-per-se liability question rather than submitting separate questions for each penal statute he alleged Gilfour violated. We conclude that Lesley failed to preserve this complaint for our review.

"Negligence per se is a common-law doctrine in which a duty is imposed based on a standard of conduct created by a penal statute rather than on the reasonably prudent person test used in pure negligence claims." *Smith v. Merritt*, 940 S.W.2d 602, 607 (Tex. 1997). Lesley asserted that three provisions of the penal code created separate standards of conduct that Gilfour violated: penal code sections 46.06(a)(2), 46.13(b)(1), and 46.13(b)(2). Before trial, Lesley moved for partial summary judgment on his negligence per se claim. The trial court granted that motion as to Lesley's section-46.13(b)(2) liability theory but

4

denied it as to his section-46.06(a)(2) and section-46.13(b)(1) theories. However, despite having granted Lesley summary judgment on his section-46.13(b)(2) liability theory, the trial court nevertheless submitted to the jury a broad-form negligence-per-se question that included instructions on all of Lesley's liability theories, including his section-46.13(b)(2) theory.

Lesley argues that the trial court's inclusion of all three of his negligence per se liability theories in one broad-form jury question was erroneous because doing so effectively allowed the jury the opportunity to supersede the trial court's previous summary judgment ruling. He contends that the trial court's interlocutory order granting summary judgment on his section-46.13(b)(2) liability theory effectively rendered that particular theory "invalid" for jury-charge purposes.[4] *See Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 389 (Tex. 2000) ("When a single broad-form liability question erroneously commingles valid and invalid liability theories and the appellant's objection is timely and specific, the error is harmful when it cannot be determined whether the improperly submitted theories formed the sole basis for the jury's finding."). Thus, Lesley contends, it was error to include his section-46.13(b)(2) liability theory alongside his other two liability theories in one broad-form question because it cannot be determined whether the jury in any way based its no-negligence finding on a determination

---

[4]We express no opinion on whether a trial court's granting of an interlocutory summary judgment on a theory of liability renders that particular theory invalid for jury-charge purposes.

5

that, contrary to the trial court's summary judgment, Gilfour did not violate section 46.13(b)(2).

The complaint that the submission of a broad-form liability question was erroneous because it included an invalid liability theory is one that must be preserved in the trial court. *See Casteel*, 22 S.W.3d at 387–89; *Duradril, L.L.C. v. Dynomax Drilling Tools, Inc.*, 516 S.W.3d 147, 157–58 (Tex. App.—Houston [14th Dist.] 2017, no pet.). To preserve such a complaint, a party must timely and specifically object to the broad-form submission. *See Casteel*, 22 S.W.3d at 387–89; *Duradril*, 516 S.W.3d at 157–58. Lesley did not object to the broad-form submission of the negligence-per-se liability question on the ground that it contained an invalid liability theory, and therefore his first issue is not preserved for our review. *See Casteel*, 22 S.W.3d at 387–89 (explaining that timely and specific objection is necessary to preserve complaint that broad-form liability question erroneously commingled valid and invalid liability theories); *Duradril*, 516 S.W.3d at 157–58 (holding that any error in broad-form submission of jury questions that included allegedly invalid liability and damages theories was not preserved because appellants did not timely and specifically object). We overrule Lesley's first issue.

## III. THE TRIAL COURT'S JURY INSTRUCTION ON PENAL CODE SECTION 46.13(c)(1)'S AFFIRMATIVE DEFENSE

In his second issue, Lesley again challenges the jury charge, arguing that the trial court erred by including an affirmative-defense instruction in its

6

negligence-per-se liability jury question. We conclude that Lesley failed to preserve this complaint for our review.

As we noted above, in its negligence-per-se liability question, the trial court included an instruction on Lesley's section-46.13(b)(2) liability theory. It also included an instruction on penal code section 46.13(c)(1), which provides an affirmative defense to prosecution under section 46.13(b)(2). *See* Tex. Penal Code Ann. § 46.13(c)(1) (West 2011). Lesley contends that because the trial court granted him summary judgment on his section 46.13(b)(2) theory of liability, it necessarily found that Gilfour violated that statute and that such violation was not excused by the affirmative defense provided by section 46.13(c)(1). Because the trial court had already determined that section 46.13(c)(1)'s affirmative defense was inapplicable, Lesley argues, the trial court erred by submitting to the jury an instruction concerning that affirmative defense.

A party objecting to a jury charge must point out distinctly the objectionable matter and the grounds of the objection. Tex. R. Civ. P. 272, 274; *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 43 (Tex. 2007); *see* Tex. R. App. P. 33.1. To preserve error in a jury charge, the complaining party must timely and plainly make the trial court aware of the complaint and obtain a ruling. Tex. R. Civ. P. 272, 274; *Ledesma*, 242 S.W.3d at 43; *see* Tex. R. App. P. 33.1. The record reflects that Lesley did not object to the affirmative-defense instruction he

7

complains of in his second issue.[5]  He thus failed to preserve this complaint for our review.  *See* Tex. R. Civ. P. 272, 274; *Ledesma*, 242 S.W.3d at 43; Tex. R. App. P. 33.1.  We overrule Lesley's second issue.

## IV.  THE TRIAL COURT'S JURY INSTRUCTION ON CIVIL PRACTICES & REMEDIES CODE SECTION 93.001(a)(2)'S AFFIRMATIVE DEFENSE OF SUICIDE

In his third issue, Lesley contends that the trial court erred by including, pursuant to civil practices and remedies code section 93.001(a)(2), an instruction on the affirmative defense of suicide in the jury charge (Suicide-Defense Instruction).  Section 93.001(a)(2) provides a defendant with an affirmative defense in a wrongful death action if at the time the cause of action arose, the plaintiff was "committing or attempting to commit suicide, and the plaintiff's conduct in committing or attempting to commit suicide was the sole cause of the damages sustained."  Tex. Civ. Prac. & Rem. Code Ann. § 93.001(a)(2) (West 2011).  That affirmative defense is not available, however, "if the suicide or attempted suicide was caused in whole or in part by a failure on the part of any defendant to comply with an applicable legal standard."  *Id.*  Lesley argues that

---

[5]We note that Lesley states in his brief that the trial court "refus[ed] to tender [his] requested instructions to the jury."  He attached as an exhibit to his brief a document entitled "Plaintiff's Proposed Court's Instructions to the Jury."  However, this document is not in the appellate record, and we do not consider it.  *See Alphin v. Huguley Nursing Ctr.*, 109 S.W.3d 574, 576 n.2 (Tex. App.—Fort Worth 2003, no pet.) (refusing to consider expert report that was not in the appellate record).  What the appellate record shows is that when the trial court asked during the charge conference whether Lesley's counsel had any objection to including the affirmative-defense, Lesley's counsel replied, "Plaintiff has no objection, Your Honor."

the trial court erred by including the suicide-defense instruction in the jury charge because the evidence was insufficient to support a finding that Sam's death resulted solely from his committing suicide and because the evidence conclusively established that Sam's death resulted in whole or in part from Gilfour's breaching penal code section 46.13(b)(2).

## A. STANDARD OF REVIEW

We review a trial court's decision to submit a particular jury-charge instruction for an abuse of discretion. *Thota v. Young*, 366 S.W.3d 678, 687 (Tex. 2012); *Ace Fire Underwriters Ins. Co. v. Simpkins*, 380 S.W.3d 291, 303 (Tex. App.—Fort Worth 2012, no pet.). The trial court has considerable discretion in determining proper jury instructions, and if there is any support in the evidence for an instruction, the instruction is proper. *Thota*, 366 S.W.3d at 687.

## 1. Evidence of Suicide

Lesley first argues that the suicide-defense instruction was improper because the evidence did not support a finding that Sam committed suicide. *See* Tex. Civ. Prac. & Rem. Code Ann. § 93.001(a)(2). The record, however, contains evidence supporting a conclusion that the sole cause of Sam's death was suicide.

Scott Newby testified at trial by video deposition. He lived at Peter and Joanna's house, and while he was living there, he had the opportunity to spend time with Sam. Newby was the first person who found Sam after the shooting,

9

and he testified that he discovered Sam laying on his back in bed with his right hand still gripping the revolver and that he was unresponsive. When asked what he thought happened, Newby testified that based upon the placement of the bullet in Sam's head and the fact that he was still gripping the revolver after the shooting, he believed Sam had killed himself.

Peter also testified by video deposition. He testified that he had driven Sam to school a couple of days before the shooting and that during the drive, Sam expressed that he was angry with Joanna and that he did not want to live at home with her anymore because she was always screaming at him. He stated that he had told Joanna not to scream at Sam so much. He further said that he had told Sam, in reference to Joanna's screaming at him, that Joanna was not well and that he needed to just put up with it. Peter testified that he knew Sam was sick of Joanna's screaming and yelling. Peter related that Jamie had once called him and said that Joanna was drunk and was chasing Sam up the street screaming "all the F's and the B's that she could think of" at him. When asked whether he had an opinion as to what happened to Sam, Peter replied that based on Sam's autopsy, the placement of the bullet in his head, and his discussion with a couple of doctors who were friends of his, he believed that Sam had either committed suicide or was playing Russian roulette.

A portion of Ethan's deposition testimony was read to the jury as well. Relevant here, Ethan testified that after dinner on February 22, 2012, he and Sam went upstairs to Sam's room and played video games. Ethan stated that

10

just before it was time for him to leave, Joanna had gotten angry with Sam and yelled at him because his room was not clean. Ethan testified that after Joanna yelled at Sam about his room but before Ethan and Jamie left the house, Sam told him "how he was pissed off" at Joanna. Ethan said that Sam frequently got upset with Joanna and she was "pretty hard on him." He also recalled an occasion where Joanna was intoxicated and started "freaking out," causing Sam to flee into the back alley in his bare feet. Ethan stated that Sam stayed the night at his house because Joanna was screaming and yelling and out of control. He testified that on several occasions, Joanna became intoxicated and got angry and irritable toward Sam. Ethan stated that Sam frequently talked about how he wanted to go live with Lesley.

Based upon the above evidence, we conclude there was some evidence to support a conclusion that suicide was the sole cause of Sam's death.

## 2. Breach of a Legal Standard

Lesley also argues that the suicide-defense instruction was improper because the evidence at trial conclusively proved that Sam's death resulted in whole or in part from Gilfour's breaching penal code section 46.13(b)(2). *See* Tex. Civ. Prac. & Rem. Code Ann. § 93.001(a)(2). Because Sam's death resulted at least in part from Gilfour's breaching section 46.13(b)(2), Lesley argues, it was error to include the suicide-defense instruction in the jury charge. *See id.* (providing that "if the suicide or attempted suicide was caused in whole or in part by a failure on the part of any defendant to comply with an applicable legal

11

standard, then such suicide or attempted suicide shall not be a defense"). We conclude, however, that the evidence at trial raised a fact issue as to whether Gilfour breached penal code section 46.13(b)(2). Section 46.13(b)(2) provides,

> (b) A person commits an offense if a child gains access to a readily dischargeable firearm and the person with criminal negligence:
>
> (2) left the firearm in a place to which the person knew or should have known the child would gain access.

Tex. Penal Code Ann. § 46.13(b)(2) (West 2011). A "readily dischargeable firearm" means "a firearm that is loaded with ammunition, whether or not a round is in the chamber." *Id.* § 46.13(a)(2). There was conflicting evidence at trial concerning whether Gilfour left a "readily dischargeable" firearm with Sam. Gilfour testified that he had inspected the revolver before he brought it to Sam and made sure that it was not loaded with ammunition. Gilfour testified that before Sam took possession of the unloaded revolver, Gilfour was seated at the kitchen table along with Joanna, Sam, and Ethan. Gilfour stated that he pulled out the unloaded revolver and put it in the center of the table, that Joanna gave permission for Sam to have it, that Joanna got up and walked away from the table, and that Sam then grabbed the gun to look at it and handle it. Gilfour also testified that he left the table after Sam picked up the revolver, and he stated that he believed at that point the responsibility for the revolver was with Joanna "because she had accepted the gun as a gift out of an act of kindness from me (Gilfour) to Sam."

12

There was also evidence raising a fact issue as to whether the revolver was readily dischargeable after Gilfour left the garage after witnessing Sam holding the revolver and noticing that .22 caliber long bullets had been loaded in the revolver's cylinder. Ethan testified that after Sam took possession of the revolver, he and Sam went out to the garage. Ethan stated that Sam was handling the revolver and "just messing around" with it, and he also stated that the revolver was not loaded. Ethan stated that at some point, Sam started filing the front end of a .22 caliber long bullet, attempting to fit it inside the revolver. Ethan testified that Gilfour came into the garage and told Sam that .22 caliber long bullets would not fit in the revolver. Ethan said that Sam then took the bullet out and sat it down and that Sam did not try to file another bullet the rest of the night.

Based upon the above evidence, there was a fact issue concerning the question of whether Gilfour gave Sam access to a firearm that was readily dischargeable.

Lesley also appears to argue that the trial court, by granting partial summary judgment on his section-46.13(b)(2) negligence per se theory, had already conclusively determined that Gilfour violated section 46.13(b)(2). That order was, of course, interlocutory, and the trial court had the power to change or modify it until its judgment on the merits of the case became final. *See Dunagan v. Coleman*, 427 S.W.3d 552, 558 (Tex. App.—Dallas 2014, no pet.). The record here shows that the trial court set aside its partial summary judgment.

13

After both sides rested and closed, Lesley's counsel moved for a partial directed verdict on the ground that the evidence established, as a matter of law, his section-46.13(b)(2) theory of negligence per se, the same theory on which the trial court had previously granted him partial summary judgment. During the argument on the directed verdict, Lesley's counsel reminded the trial court that it had already ruled "as a matter of law that [Gilfour] violated [section 46.13(b)(2)]." Gilfour's counsel argued in response that the trial court's summary judgment was merely interlocutory, that the evidence presented at trial was sufficient to create a fact issue as to whether Gilfour violated section 46.13(b)(2), and that consequently, Gilfour was entitled to challenge the trial court's partial summary judgment. The trial court then denied Lesley's motion for directed verdict.[6] And as noted above, the trial court ultimately submitted Lesley's section-46.13(b)(2) liability theory to the jury without objection from Lesley. The trial court thus implicitly set aside its partial summary judgment on that issue. Therefore, to the extent Lesley argues that the trial court erred in submitting the suicide-defense instruction because it had already conclusively determined, by virtue of its partial summary judgment, that Gilfour had violated penal code section 46.13(b)(2), that argument is unavailing.

---

[6]During an earlier portion of the argument on Lesley's directed-verdict motion, the trial court expressly stated its belief that the trial evidence created a fact issue as to whether the revolver was readily dischargeable.

14

### 3. No Abuse of Discretion

Having concluded that there was some evidence to support a conclusion that Sam's death resulted solely from his committing suicide and that the evidence demonstrated a fact issue as to whether Gilfour breached penal code section 46.13(b)(2), we conclude the trial court did not abuse its discretion by including the suicide-defense instruction in the jury charge. *See* Tex. R. Civ. P. 278 ("The court shall submit the questions, instructions and definitions . . . raised by the written pleadings and evidence."). We overrule Lesley's third issue.

## V. CONCLUSION

Having overruled all of Lesley's issues, we affirm the trial court's judgment. *See* Tex. R. App. P. 43.2(a).

/s/ Lee Gabreil

LEE GABRIEL
JUSTICE

PANEL: LIVINGSTON, C.J.; GABRIEL and PITTMAN, JJ.

DELIVERED: July 20, 2017

15