

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-14-00494-CV

**UNITED PARCEL SERVICE, INC.** and Roland Leal,
Appellants

v.

Robert Scott **RANKIN** and Rachelle Rankin, individually and as next friend for Avery Rankin,
Kara Rankin, and Samuel Rankin, minors,
Appellees

From the 224th Judicial District Court, Bexar County, Texas
Trial Court No. 2011-CI-07922
Honorable Cathleen M. Stryker, Judge Presiding

Opinion by:    Karen Angelini, Justice

Sitting:    Karen Angelini, Justice
Marialyn Barnard, Justice
Rebeca C. Martinez, Justice

Delivered and Filed:  June 3, 2015

AFFIRMED

This appeal involves a personal-injury suit brought by Robert Scott Rankin and his family against United Parcel Service, Inc. and Roland Leal (collectively "UPS"). UPS appeals the over $4 million judgment granted in favor of Rankin and his family. We affirm.

### BACKGROUND

On July 15, 2009, at about 6:00 p.m., Roland Leal, a driver with UPS, parked his UPS package vehicle in front of a residence at 109 Ranger Creek Road, Boerne, Texas, to make a delivery on his normal route. Because he intended to park the vehicle for about two minutes, he

left the vehicle halfway on the asphalt shoulder and halfway on the lane of traffic. Before leaving the truck to deliver a package, Leal turned on the vehicle's flashing hazard lights. The conditions were sunny and clear, with the heat index up to 112 degree Fahrenheit, and traffic was light. At trial, UPS introduced evidence that the view of the parked UPS vehicle was unobstructed for more than 2,000 feet down the roadway. Rankin, however, also introduced evidence that the UPS vehicle was brown and stopped under the canopy of a tree with brown leaves with a brown hill framing the background.

Earlier that day, Robert Scott Rankin had finished his first of two bicycle rides. In the late afternoon, Rankin went out for his second, longer bicycle ride. At about 6:00 p.m., Rankin was on his way back to his home and was traveling eastbound on Ranger Creek Road. Rankin rode straight into the back of Leal's parked UPS vehicle and suffered severe personal injuries as a result of the accident. At trial, UPS's expert testified that he believed Rankin had his head down at the time of the collision. Rankin testified that he does not remember what happened. Leal testified that he did not see the accident. He had just delivered his package, was in the front of the truck, and was about to leave when he heard the sound of Rankin hitting the back of the vehicle.

Sergeant Tom Allison with the Kendall County Sheriff's Office investigated the accident. When he arrived on the scene, the hazard lights of the UPS vehicle were still flashing. Sergeant Allison testified that Rankin said he never saw the UPS vehicle before he rode into the back of it. Sergeant Allison, who has received training in accident reconstruction and reporting, testified that after examining the scene of the accident and talking with Rankin, Leal, and the owner of the residence, Megan McGehee, Sergeant Allison determined that the UPS vehicle had been parked when Rankin rode into the back of it. Sergeant Allison testified that Rankin had a duty to keep a lookout for vehicles; that there was sufficient space for a cyclist to ride around the UPS vehicle; that the UPS vehicle would have been visible and obvious to other motorists; and that he did not

believe Leal had violated any parking laws. Further, Sergeant Allison testified that he was familiar with the area and that it was a common practice for commercial vehicles to park in a manner similar to the UPS vehicle when making a delivery or pick-up at the residence. It was also common practice for residents to park in the same manner when opening gates to their driveways. Sergeant Allison testified that he did not charge Leal with illegal parking.

As a result of the accident, Rankin is now a partial quadriplegic. He, his wife, and his children (collectively "Rankin") sued UPS for negligence. At trial, the jury was asked about and given instructions regarding both negligence per se and common-law negligence. In Questions 1 and 2 the jury was asked about negligence per se. In Texas, the laws regarding parking differ depending on whether one is parked within a "residence district." *See* TEX. TRANSP. CODE ANN. § 545.301 (West Supp. 2014) (prohibiting parking "on the main traveled part of a highway outside a business or residence district" unless certain exceptions apply). Thus, in Question 1, the jury was asked whether when the accident occurred, the UPS vehicle was "stopped, parked, or standing outside of a 'residence district.'"[1] It was instructed that a "residence district" is "the territory adjacent to and including a highway, if at least 300 feet of the highway frontage is primarily improved with (a) residences or (b) buildings used for business purposes and residences."[2] It answered in the affirmative. In Question 2, the jury was asked whether the negligence, if any, of Leal and/or Rankin proximately caused the occurrence in question. With respect to Leal, the jury was instructed the following:

> The law prohibits stopping, parking, or leaving standing an attended or unattended vehicle on the main traveled part of a highway **outside a business or residence** district unless:

---

[1]This definition tracked section 545.301 of the Texas Transportation Code.
[2]This definition tracked the definition of "residence district" found in section 541.102(2) of the Texas Transportation Code.

(1) stopping, parking, or leaving the vehicle off the main traveled part of the highway is not practicable;

(2) a width of highway beside the vehicle is unobstructed and open for the passage of other vehicles; and

(3) the vehicle is in clear view for at least 200 feet in each direction on the highway.

A failure to comply with this law by Roland Leal, if any, is negligence in itself.

(emphasis in original). With respect to Rankin, the jury was instructed the following:

> "Negligence" when used with respect to the conduct of Scott Rankin means failure to use ordinary care, that is, failing to do that which a person of ordinary prudence would have done under the same or similar circumstances or doing that which a person of ordinary prudence would not have done under the same or similar circumstances. "Ordinary care" means that degree of care that would be used by a person of ordinary prudence under the same or similar circumstances.

The jury answered in the affirmative with respect to both Leal and Rankin.

In Question 3, the jury was again asked whether the negligence of Leal and/or Rankin proximately caused the occurrence in question. The jury was instructed about the definition of "negligence" and "ordinary care."

> "Negligence" when used with respect to the conduct of Roland Leal and Scott Rankin means failure to use ordinary care, that is, failing to do that which a person of ordinary prudence would have done under the same or similar circumstances or doing that which a person of ordinary prudence would not have done under the same or similar circumstances. "Ordinary care" means the degree of care that would be used by a person or ordinary prudence under the same or similar circumstances.

The jury was further instructed the following:

> **In your determination of this question, you shall not consider whether Roland Leal failed to comply with the law regarding parking outside of a business or residence district, but rather only consider the negligence standard set forth above for both Roland Leal and Robert Scott Rankin.**

(emphasis in original). Thus, Question 3 question related only to Rankin's common-law negligence claim, and not to Rankin's negligence per se claim. With respect to both Leal and Rankin, the jury answered the question in the affirmative.

In Question 4, the jury was asked to assign percentages of responsibility to those it found caused or contributed to cause the occurrence. It found both Rankin and Leal 50% responsible for the occurrence, respectively. With respect to damages, the jury found over $7 million would fairly and reasonably compensate Rankin for his injuries. The jury also awarded Rankin's wife almost $1 million for loss of household services and loss of consortium, and each of his children $450,000 for loss of parental consortium. The trial court then signed a judgment pursuant to the verdict and Rankin's proportionate responsibility. UPS now appeals.

## PROXIMATE CAUSE

UPS argues that the evidence is factually and legally insufficient to support the finding that Leal's parking of the UPS vehicle proximately caused Rankin's injuries. "In reviewing a verdict for legal sufficiency, we 'must view the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not.'" *Reeder v. Wood Cnty. Energy, LLC*, 395 S.W.3d 789, 795 (Tex. 2012) (quoting *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005)). A legal sufficiency challenge will be sustained when "the evidence offered to prove a vital fact is no more than a mere scintilla." *Id.* "Evidence does not exceed a scintilla if it is so weak as to do no more than create a mere surmise or suspicion that the fact exists." *Akin, Gump, Strauss, Hauer & Feld, LLP v. Nat'l Dev. & Research Corp.*, 299 S.W.3d 106, 115 (Tex. 2009) (citations omitted). In reviewing a verdict for factual sufficiency, we consider all the evidence supporting and contradicting the jury's finding, and will set aside the judgment only if the finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Villarreal v. Guerra*, 446 S.W.3d 404, 411 (Tex. App.—San Antonio 2014, pet. denied). We note that as the factfinder, the jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *See City of Keller*, 168 S.W.3d at 819. Thus, a jury may believe or disbelieve the testimony of a witness, in

whole or in part, and may resolve any inconsistencies in a witness's testimony. *See Villarreal*, 446 S.W.3d at 411; *Dwairy v. Lopez*, 243 S.W.3d 710, 713-14 (Tex. App.—San Antonio 2007, no pet.). As an appellate court, we may not pass upon the credibility of the witnesses, or substitute our judgment for that of the jury, even if the evidence would clearly support a different result. *Villarreal*, 446 S.W.3d at 411 (citing *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998)).

Proximate cause includes cause-in-fact and foreseeability. *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex. 1995). UPS argues that the evidence is legally and factually insufficient to support both cause-in-fact and foreseeability. "Foreseeability exists when the actor as a person of ordinary intelligence should have anticipated the dangers his negligent act [or omission] creates for others." *D. Houston, Inc. v. Love*, 92 S.W.3d 450, 454 (Tex. 2002) (citation omitted). Cause-in-fact "is established when the act or omission was a substantial factor in bringing about the injuries, and without it, the harm would not have occurred." *Transcon. Ins. Co. v. Crump*, 330 S.W.3d 211, 222-23 (Tex. 2010) (citation omitted). UPS points to case law for the proposition that the "substantial factor" requirement is not met if the injury is a "remote" consequence of the defendant's conduct. *See Rodriguez-Escobar v. Goss*, 392 S.W.3d 109, 113 (Tex. 2013) (stating that "an actor's negligence may be too attenuated from the resulting injuries to the plaintiff to be a substantial factor in bringing about the harm") (citation omitted).

According to UPS, Leal's parking of the UPS vehicle on the road was not a substantial factor in causing Rankin's injuries and thus was not a cause-in-fact. It argues that "the evidence allows only one logical inference, namely, that the sole proximate cause of Mr. Rankin's injury was his own negligence in riding his bike on a hot day after suffering from heat-induced illness earlier in the day, with his head down for over 2000 feet, without keeping any lookout for vehicles

or people on this residential road." Thus, UPS claims the undisputed evidence shows that Rankin was the sole proximate cause of his injuries.

Rankin, however, points out that many facts supporting UPS's assertion that he was the sole proximate cause of his injuries were, in fact, disputed at trial. While UPS claims Rankin "suffer[ed] from heat-induced illness earlier in the day," Rankin points out that this fact was disputed. Rankin testified he had not suffered from heat-induced illness after his earlier ride. Similarly, while UPS claims that Rankin had "his head down for over 2000 feet," Rankin emphasizes that at trial, this fact was also disputed, as Rankin testified at trial that he had reached the top of a hill and was descending at about forty to forty-five miles per hour when he reached the flat part of Ranger Creek Road. According to Rankin, at those speeds, he would never have kept his head down for that amount of distance. Further, Rankin argues that although UPS claims the undisputed evidence shows Rankin was "not keeping a lookout for vehicles or people on this residential road," Rankin points out that the evidence was disputed at trial whether Ranger Creek Road was a residential road or whether he was keeping a lookout. Rankin stresses that the evidence at trial showed that the UPS truck was not as visible as UPS characterizes in its brief. The evidence showed that Leal stopped the vehicle under a tree overhang in the summer at around 6:00 p.m. in the evening when the sun was low in the sky. Because it was summer, the backdrop behind the brown UPS truck was a brownish hill. For all these reasons, we disagree with UPS that the evidence only allows for the logical inference that Rankin's negligence was the sole proximate cause of his injuries.

Instead, we hold the evidence is legally and factually sufficient to support the jury's findings that both Leal's and Rankin's negligent acts proximately caused the occurrence. We note that it was undisputed that Leal stopped his UPS vehicle partially on the road and partially off the road. It was also undisputed that Leal could have pulled off the road entirely by pulling into the

driveway of 109 Ranger Creek Road or by pulling off the road completely to park on dirt. UPS claims "there is no evidence that Leal should have anticipated that his conduct of parking his car for two minutes with its hazard lights flashing where it was visible for over 2000 feet down a straight and level roadway would create a danger or cause injury." However, we agree with Rankin that there was evidence that Leal parked unreasonably, unsafely, and (as will be explained in a subsequent section) illegally. There was also evidence that the speed limit on Ranger Creek Road was forty-five miles per hour. Rankin explained during his trial testimony that as a bicyclist, he rode his bicycle as close to the side of the road as possible for two reasons: (1) to be courteous to the other drivers on the road; and (2) for safety reasons. From this evidence, the jury could reasonably infer that Leal should have foreseen cars and bicyclists traveling on the highway and that parking the vehicle on the road was an obstruction to others. Thus, we hold that the evidence is both legally and factually sufficient to support the jury's findings that the acts of both Leal and Rankin were proximate causes of the occurrence.

### PROPORTIONATE RESPONSIBILITY

UPS also argues the evidence is factually insufficient to support the jury's findings that Rankin's responsibility for the occurrence was equal to (and not greater than) Leal's responsibility. UPS contends that "the uncontroverted evidence showed that the view of the parked UPS package car was unobstructed for over 2000 feet of flat, level roadway, and the accident occurred on a clear, sunny day." As explained above, however, the accident occurred at 6:00 p.m., the UPS package car was parked under a canopy of a large tree, and the UPS package car was brown and the background hill was also brown. Further, Leal parked his vehicle halfway on a road with a forty-five miles per hour speed limit. There is factually sufficient evidence to support the jury's finding that Leal and Rankin were each 50% responsible for the occurrence.

Here, the jury made two specific findings with regard to negligence: one finding was based on negligence per se and the other was based on common-law negligence. The rest of UPS's issues relate to Rankin's negligence per se claim and not to Rankin's common-law negligence claim. Thus, the judgment can be affirmed based on the jury's finding of common-law negligence without regard to the negligence per se claim. UPS disagrees, claiming that despite the jury's finding of common-law negligence, if there is insufficient evidence to support Rankin's negligence per se claim, it is harmed because of the jury's proportionate responsibility finding of 50% liability on Rankin and Leal, respectively. According to UPS, "[i]t is impossible to know precisely how much of that 50% responsibility is based on negligence per se from illegal parking (Questions 1 and 2), and how much is based on simple negligence (Question 3)." UPS argues that if even "1% of that 50% is based on negligence per se, there is reversible error" because a finding that Rankin was 51% responsible would bar any award to him. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 33.001 (West 2015).

In support of its argument, UPS relies on *Romero v. KPH Consolidation, Inc.*, 166 S.W.3d 212 (Tex. 2005). In *Romero*, the plaintiff brought a negligence claim against a hospital based on two different theories of negligence: (1) negligently delaying a blood transfusion for the plaintiff while he was in surgery and (2) malicious credentialing of the surgeon. *Id.* at 214. The jury was instructed that if it found liability under either theory, it should apportion responsibility for the plaintiff's injury, which it did: 40% to the hospital; 40% to the surgeon; and 20% to the anesthesiologist. *Id.* at 219. On appeal, the supreme court determined that there was no evidence to support judgment against the hospital for malicious credentialing. *Id.* at 224. The court then considered whether the judgment for plaintiff could rest on the jury's finding that the hospital negligently delayed a blood transfusion, or whether reversal and remand was required because of error in the jury question regarding the apportionment of responsibility. *Id.* at 225. The court

explained that in answer to Question 1, the jury found that the plaintiff's injury was caused by the negligence of the hospital, surgeon, and anesthesiologist. *Id.* In answer to Question 2, the jury found that the hospital's malicious credentialing of the surgeon also caused the plaintiff's injury. *Id.* "Thus, the jury was instructed to apportion responsibility among [the hospital], [the surgeon], and [the anesthesiologist], and in doing so, to consider [the hospital]'s malicious credentialing of [the surgeon]." *Id.*

In considering whether the hospital was harmed by the erroneous submission of Question 2, the supreme court in *Romero* emphasized that it had previously held in *Crown Life Insurance Co. v. Casteel*, 22 S.W.3d 378, 381 (Tex. 2000), that "submitting invalid theories of liability in a single broad-form jury question is harmful error when it cannot be determined whether the jury based its verdict on one or more of the invalid theories." *Romero*, 166 S.W.3d at 226. Similarly, the court noted that in *Harris County v. Smith*, 96 S.W.3d 230, 233-34 (Tex. 2002), it had held that a broad-form question about damages cannot include elements for which there is no evidence. *Romero*, 166 S.W.3d at 226. In considering the facts of its case, the *Romero* court reasoned that "[h]aving found malicious credentialing, the jury could not conceivably have ignored that finding in apportioning responsibility." *Id.* at 227. The *Romero* court explained that "[w]hile in other instances a jury may simply ignore a factor in the charge that lacks evidentiary support, there are other instances – and this case is one – where the jury is as misled by the inclusion of a claim without evidentiary support as by a legally erroneous instruction." *Id.* Thus, the court held that "[i]n all circumstances in which a trial court's error in instructing a jury to consider erroneous matters, whether an invalid liability theory or an unsupported element of damage, prevents the appellant from demonstrating the consequences of the error on appeal, the same analysis must be applied." *Id.* at 227 (internal quotation omitted).

However, in so holding, the *Romero* court specifically stated that it was not holding "that the error of including a factually unsupported claim in a broad-form jury question is always reversible." *Id.* The court noted that Rule 44.1(a)(2) only requires reversal when the error "probably prevented the appellant from properly presenting the case to the court of appeals." *Romero*, 166 S.W.3d at 227. "But unless the appellate court is reasonably certain that the jury was not significantly influenced by issues erroneously submitted to it, the error is reversible." *Id.* (internal quotation omitted). The court explained that it had "no such reasonable certainty here; on the contrary, [the court was] reasonably certain that the jury *was* significantly influenced by the erroneous inclusion of the factually-unsupported malicious credentialing claim in the apportionment question." *Id.* at 228. Thus, the supreme court concluded the erroneous submission of the malicious credentialing claim required reversal of the judgment. *Id.*

The instant case, however, is distinguishable. Although the jury found UPS liable under two different theories of liability (negligence per se and common-law negligence), both theories are based on the same negligent act by Leal: parking of the truck. Thus, regardless of whether that act is the basis of negligence per se or common-law negligence, the jury based its answers regarding Leal's proportionate responsibility on his act of parking the UPS truck. Thus, we can say with reasonable certainty that the submission of the negligence per se claim did not contribute to the jury's proportionate responsibility answer. And, because the submission of the negligence per se claim did not contribute to the jury's proportionate responsibility answer, the judgment can be affirmed based on the jury's finding of common-law negligence.

## NEGLIGENCE PER SE

Alternatively, even if the judgment could not be affirmed based on the jury's finding of common-law negligence, UPS's remaining issues regarding negligence per se would not require reversal of the judgment.

*A. The Submission of Question 1 to the Jury*

UPS argues that the trial court erred in submitting Question 1 to the jury because the "interpretation and application of the transportation code is a question of law that should have been decided by the trial court, not the jury." UPS explains that it objected at trial to Question 1 being submitted to the jury for the reason that the jury should not be asked to answer a question of law. In support of its argument, UPS cites case law for the general proposition that construction of statutory terms is a legal issue to be decided by a court. *See City of Rockwall v. Hughes*, 246 S.W.3d 621, 625 (Tex. 2008) ("Statutory construction is a legal question we review de novo."). We, however, disagree that Question No. 1 was a question of law.

Question 1 asked the jury the following:

When the accident occurred, was the UPS package car stopped, parked or standing outside of a "residence-district" as defined below?

"Residence district" means the territory adjacent to and including a highway, if at least 300 feet of the highway frontage is primarily improved with (a) residences or (b) buildings used for business purposes and residences.[3]

Question 1 is not asking the jury a question of law; it is asking the jury a question of fact: that is, whether the UPS package car was stopped, parked or standing in a residence district, which the jury had to decide by considering the legal definition of residence district it was given. That is, it had to decide whether the UPS car was stopped, parked or standing on a highway where at least 300 feet of highway frontage road was primarily improved with residences. UPS complains that in determining whether the UPS truck parked in a residence district, the jury had to necessarily consider what the word "residences" meant. However, that does not mean that the jury was asked to answer a legal question. Question 1 is no different from Questions 2 or 3, which asked the jury

---

[3]This definition of "residence district" tracked the language contained in section 541.102(2) of the Transportation Code.

whether "the negligence, if any, of the persons named below *proximately cause* the occurrence in question." (emphasis added). As in Question 1, in Questions 2 and 3 the jury necessarily had to apply the legal term proximate cause to arrive at an answer. In doing so, however, the jury did not answer a question of law – it answered a question of fact.

The difference in the jury charge between the legal term "proximate cause" and the term "residences" is that the jury was given the definition of proximate cause in the charge but was not instructed on the definition of "residences." UPS has not argued on appeal that the trial court erred by failing to instruct the jury on the definition of "residences" because UPS specifically argued at trial that such an instruction should not be given to the jury. At the charge conference, Rankin proposed a definition of "residences" to be included with Question 1. Although UPS objected to Rankin's proposed definition, it did not submit its own definition of "residences." Instead, UPS's attorney specifically argued to the trial court, "I'm very concerned if you throw in a definition from a different case [the one proposed by Rankin], interpreting a different statute, it's going to confuse the jury and, perhaps, change the meaning, intent of the statute, *so the safe course is just to not add any additional definitions that are not in the statute*." (emphasis added). Thus, UPS could not now on appeal complain about the legal term "residences" not being defined for the jury.[4]

UPS further complains that the trial court should not have submitted Question 1 to the jury because "the relevant characteristics of 109 Ranger Creek Road were not in dispute." It then cites *Ace Fire Underwriters Insurance Co. v. Simpkins*, 380 S.W.3d 291, 303 (Tex. App.—Fort Worth 2012, no pet.), for the proposition that "[w]hen facts are undisputed or conclusively established,

---

[4]To complain on appeal that the trial court erred in failing to submit a definition, a party must request a substantially correct definition in writing. *See* TEX. R. CIV. P. 278 ("Failure to submit a definition or instruction shall not be deemed a ground for reversal of the judgment unless a substantially correct definition or instruction has been requested in writing and tendered by the party complaining of the judgment.").

there is no need to submit those issues to the jury." In *Ace Fire*, the appellant argued that the trial court erred by submitting a producing cause definition and instruction in the jury charge. *Id.* In deciding that any error was harmless, the court noted that "[w]hen facts are undisputed or conclusively established, there is no need to submit those issues to the jury." *Id.* Because there was no dispute that the deceased's fall was a producing cause of his death, the court explained that "[i]t was unnecessary for the trial court to submit it to the jury." *Id.* The court concluded that the "trial court's unnecessary inclusion of producing cause did not create a higher or more onerous burden for Ace Fire because producing cause was superfluous language concerning an undisputed fact." *Id.* at 303-04. The court then cited case law for the proposition that the "submission of undisputed facts does not ordinarily result in reversible error." *Id.* at 304. Similarly, in this case, even if the facts were undisputed, no reversible error resulted from the submission of Question 1 because, as will be explained in the subsequent section about sufficiency, the evidence at trial supports the jury's finding that the UPS vehicle was not parked in a residence district.

### B. *Sufficiency of the Evidence with Regard to the Jury's Negligence Per Se Finding*

UPS argues that there is legally and factually insufficient evidence to support the jury's negligence per se finding, specifically as it relates to Leal parking the UPS vehicle outside a residence district. Rankin's negligence per se claim was based on section 545.301 of the Texas Transportation Code, titled "Stopping, Standing, or Parking Outside a Business or Residence District." It provides the following:

(a) An operator may not stop, park, or leave standing an attended or unattended vehicle on the main traveled part of a highway outside a business *or residence district* unless:

> (1) stopping, parking, or leaving the vehicle off the main traveled part of the highway is not practicable;
> (2) a width of highway beside the vehicle is unobstructed and open for the passage of other vehicles; and

(3) the highway is in clear view for at least 200 feet in each direction on the highway.

(b) This section does not apply to an operator of:

(1) a vehicle that is disabled while on the paved or main traveled part of a highway if it is impossible to avoid stopping and temporarily leaving the vehicle on the highway;

(2) a vehicle used exclusively to transport solid, semisolid, or liquid waste operated at the time in connection with the removal or transportation of solid, semisolid, or liquid waste from a location adjacent to the highway; or

(3) a tow truck, as defined by Section 545.157(e), that is performing towing duties under Chapter 2308, Occupations Code.

TEX. TRANSP. CODE ANN. § 545.301 (West Supp. 2014) (emphasis added).

The Transportation Code defines "residence district" as "the territory, other than a business district, adjacent to and including a highway, *if at least 300 feet of the highway frontage is primarily improved with*: (A) *residences*; or (B) buildings used for business purposes and residences." TEX. TRANSP. CODE ANN. § 541.102(2) (West 2011) (emphasis added). With respect to how "residences" relates to section 541.102(2), the term is not defined by the Transportation Code. As noted, the jury charge tracked section 541.102(2)'s definition of "residence district," but did not include a definition of "residences." To determine whether there was sufficient evidence to support the jury's finding of negligence per se, we must determine what the term "residences" means in the context of sections 545.301 and 541.102 of the Transportation Code.[5]

"We construe a statute's words according to their plain and common meaning unless they are statutorily defined otherwise, a different meaning is apparent from the context, or such a construction leads to absurd results." *Union Carbide Corp. v. Synatzske*, 438 S.W.3d 39, 52 (Tex. 2014). "Statutory construction also requires us to take statutes as we find them, understanding that

---

[5]In considering sufficiency of the evidence, we must necessarily consider what the term "residences" means with respect to Question, just as we had to consider what the term "proximate cause" meant in Questions 2 and 3.

the Legislature purposefully selected the words chosen" *Sw. Bell Tele., L.P. v. Emmett*, No. 13-0584, 2015 WL 1285326, at \*3 (Tex. Mar. 20, 2015).

UPS argues that the term "residences" "refers to land being used for residential purposes (not 'dwellings' or structures upon that land, as [Rankin] argued at trial)." That is, UPS contends that "residences" refers to the houses and *all* the land around the houses. According to UPS, this interpretation "is supported by the plain language of the statute, and the Legislature's decision to use the term 'residences' in this part of the statute but 'dwellings' in another part of the same statute (a distinction that basic rules of statutory construction require courts to consider deliberate)." UPS is referring to section 541.102(3), which defines an "urban district":

> "Urban district" means the territory adjacent to and including a highway, if the territory:
>     (A) is not in a municipality; and
>     (B) is improved with structures that are used for business, industry, or *dwelling houses* and located at intervals of less than 100 feet for a distance of at least one-quarter mile on either side of the highway.

TEX. TRANSP. CODE ANN. § 541.102(3) (West 2011) (emphasis added).

Rankin responds that UPS's interpretation leads to absurd results. For example, Rankin argues that under UPS's interpretation, homes on extremely large acreage could conceivably qualify as residence districts. Instead, Rankin stresses that "residences" "refer[s] to the residences themselves, not to the property on which they sit." Rankin points out that the Transportation Code must give notice to drivers about where they can legally park. According to Rankin, under UPS's interpretation of "residences" as acreage plus dwellings, a driver would not necessarily know whether at least 300 feet of the highway frontage was primarily improved with residences, thus defeating the purpose of the statute giving a motorist notice of where he could legally park.

In addition, Rankin argues the plain meaning of the word "residences" supports his interpretation. *Black's Law Dictionary* defines residence as

> 1. The act or fact of living in a given place for some time <a year's residence in New Jersey>. 2. The place where one actually lives, as distinguished from a domicile she made her residence in Oregon>. . . . 3. A house or other fixed abode; a dwelling <a three-story residence>. 4. The place where a corporation or other enterprise does business or is registered to do business <Pantheon Inc.'s principal residence is in Delaware>.

BLACK'S LAW DICTIONARY 1335 (8th ed. 2004).

We agree with Rankin. The plain meaning supports Rankin's interpretation that "residences" refers to structures and not to structures plus the acreage around it. And, we agree that UPS's interpretation can lead to absurd results and not necessarily give notice to motorists of where they can legally park.

UPS argues that even if we agree with Rankin's interpretation of "residences," there is still no evidence to support the jury's finding in Question No. 1 that when the accident occurred, the UPS vehicle was stopped, parked, or standing outside a residence district. To support this finding by the jury, there must be evidence that 300 feet of the highway frontage at 109 Ranger Creek Road was primarily improved with residences. Rankin responds that there is sufficient evidence to support the jury's finding that Leal was not parked outside a residence district. He points to the following evidence admitted at trial: Plaintiff's Exhibit 26, a survey, and Defendant's Exhibit 93A, a Google map of 109 Ranger Creek Road. Plaintiff's Exhibit 26 shows that 109 Ranger Creek Road is an eight-acre tract. Plaintiff's Exhibit 26 also shows two other tracts adjacent to 109 Ranger Creek Road: a 2.23 acre tract and a 7 acre tract. It does not show the dwellings on those tracts. Defendant's Exhibit 93A, the Google map of 109 Ranger Creek Road, includes a scale at the bottom left-hand corner; it shows the dwellings and surrounding acreage at 109 Ranger Creek Road and the surrounding properties. Defendant's Exhibit 93A alone is evidence to support the jury's finding that 109 Ranger Creek was not a residence district — that is, that 300 feet of the highway frontage was not primarily improved with residences.

UPS argues that Exhibit 93A cannot be evidence to support the jury's finding because it contains a 2013 copyright and thus is not a picture taken in 2009, the time of the accident. We first note that UPS introduced Exhibit 93A at trial during the testimony of its accident reconstructionist expert, Robert J. Swint. Swint, who had worked at NASA for twenty-five years "from a science and engineering standpoint," testified he used Google GPS aerial mapping, or GoogleMaps, to create the exhibit. He used the exhibit and the scale to testify about the distance of unobstructed view Rankin had at the time of the accident. He then used Exhibit 93A to testify about the structures on and around 109 Ranger Creek. Later, in argument to the trial court, UPS's attorney argued Exhibit 93A was evidence 109 Ranger Creek was a residence district at the time of the accident:

> And in this case plaintiffs have not presented any evidence to suggest that 109 Ranger Creek Road was not associated with other residences collectively that extended at least 300 feet. *In fact, the evidence presented in the case is just to the opposite,* that, first-off, we have at least through the survey presented — it's already been in evidence, I think it's Defendant's Exhibit 2, and I think plaintiffs actually admitted it as their own exhibit, as well, *combined with the GoogleMaps that shows the overview*, combined with the testimony of Mr. Swint and his 600-foot photograph showed that there are residences of 107, 109, 111, 115 Ranger Creek Road, all of which encompass at least 600 to 900 feet of highway frontage. Not only that, but we had Mr. Vaughn testifying, and business records of UPS that came into evidence, establishing that those residences received deliveries of packages from UPS during the two-year period leading up to the date of this accident, July 15, 2009. *That, Your Honor, I believe, is sufficient evidence to itself meet the definition of a "residential district" under the code section, Transportation Code 541.102*.

(emphasis added). Thus, at trial UPS introduced Exhibit 93A for the purpose of proving 109 Ranger Creek was a residence district at the time of the accident, argued to the trial court that it was evidence of that fact, but now on appeal claims the evidence is defective because it contains a copyright 2013. UPS is estopped from making such an argument. *See McInnes v. Yamaha Motor Corp.*, 673 S.W.2d 185, 188 (Tex. 1984) (explaining that a party on appeal will not be heard to complain of improper evidence offered by the other side when he himself introduces the same

evidence); *see also Texaco, Inc. v. Pennzoil, Co.*, 729 S.W.2d 768, 841 (Tex. App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.). Moreover, at trial, there was evidence that since the time of the accident, there have been more dwellings built around 109 Ranger Creek Road, not that dwellings had been torn down. Thus, we conclude there is legally and factually sufficient evidence to support the jury's finding that when Leal parked the UPS vehicle at 109 Ranger Creek Road, he was not parking it in a residence district.

### C. *Evidentiary Issues Regarding Negligence Per Se*

UPS argues the trial court erred in admitting the affidavit of Lori Carroll because it was irrelevant, conclusory, and constitutes hearsay. In her affidavit, Carroll, an employee of the City of Boerne, Texas, stated the following:

> . . . I have verified that on July 15, 2009, the residence address known as 109 Ranger Creek Road, Boerne, was outside the City of Boerne's corporate city limits. Furthermore, that address and area adjacent to that address were not within any business or residence district of the City as of June 15, 2009.

We review the admission of evidence for abuse of discretion. *See Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 638 (Tex. 2009). First, the affidavit was relevant. The home at 109 Ranger Creek Road had a Boerne mailing address and the parties had mentioned the city of Boerne to the jury. Thus, the affidavit makes clear that 109 Ranger Creek Road is not within Boerne city limits and cannot be part of a business or residence district in the city of Boerne. Second, whether or not the affidavit was conclusory or inadmissible hearsay, UPS suffered no harm from its admission. *See* TEX. R. APP. P. 44.1. The affidavit clearly stated that 109 Ranger Creek is not within Boerne, Texas; thus, it constituted no evidence regarding whether 109 Ranger Creek was in a residence district. And, it could not have confused the jury as the affidavit was quite clear that 109 Ranger Creek Road was not within the city of Boerne and thus could not be a business or residence district in Boerne.

UPS also argues the trial court erred in excluding portions of the deposition testimony of Sergeant Allison, the investigating officer, who they claim testified that Leal parked legally at 109 Ranger Creek Road. We review the trial court's decision to exclude portions of Sergeant Allison's testimony for abuse of discretion. *See Waste Mgmt. of Tex., Inc. v. Tex. Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 157 n.97 (Tex. 2014). UPS specifically complains that the following testimony by Sergeant Allison was excluded:

Q:  Exhibit No. 8 is Section 541.102 of the Texas Transportation Code. Specifically under section 2, it defines what a residence district is. Can you read the definition of residence?

A:  "Residence district means the territory other than a business district adjacent to and including a highway, if at least 300 feet of the highway frontage is primarily improved with a residence or building used for business purposes and residences."

Q:  And based upon I guess the information that you have personally from the residences out there and also the exhibits that you see showing the residences, would that qualify as a residence area under the statute?

[Plaintiff]: Object to form.

A:  Yes, ma'am. That shows one inch equals 200 feet on the scale here.

Q:  Okay the area where this accident happened, 109 Ranger Creek Road, do you consider that to be a residence district?

[Plaintiff]: Object to form.

A:  Yes, it's residential – residential area, yes.

Q:  Why do you say it's a residential area?

A:  Because there are houses all down Ranger Creek Road. There [are] residents that live there, so we call it a residential area.

* * * * *

Q:      Okay. And were there – was there residence [sic] to the right of 109 Ranger Creek Road?[6]

A:      To the right – I believe so, yes.

Q:      And how about to the left?

A:      Yes, ma'am. Yes, there is.

Q:      I'm going to hand that's [sic] been marked – what I marked as Exhibit No. 9, which is also another part of the Transportation Code 545.301. That statute applies in areas where it is not a residential area. Considering the information that you have as to the definition of residence under the statute, can you tell us whether or not you would apply a statute in a residence that applies to a non-residential area?

        [Plaintiff]: Object to form.

A:      This is more of relating if it's on the highway or cannot stop on a highway or main travel part of the highway outside of business [sic] area, which this – I don't believe this – this would not fit because this is not outside of a residential area or business area.

Q:      Okay.

A:      I – if that's the answer to your question. I'm not sure –

Q:      Yes. Would you apply – well–

A:      I would not apply this to that.

Q:      Okay. And the reason is because the area is what type of area?

A:      The area is residential – or residential, yes. I mean I – I'm going to say it's [a] residential area. That what it is. That's what we consider it. That's what I'm going to say.

Rankin responds that Sergeant Allison's deposition testimony is not testimony that Leal parked legally in a residence district. We agree. During his deposition testimony, Sergeant Allison would not commit to whether 109 Ranger Creek was a residence district under the Transportation

---

[6]The trial court did allow Sergeant Allison's testimony that there was a residence to the right and left of 109 Ranger Creek Road.

Code. He testified he considered 109 Ranger Creek to be a "residential area" because "there are houses all down Ranger Creek Road." "There is [sic] residents that live there, so we call it a residential area." Thus, Sergeant Allison was not basing his analysis on the Transportation Code but rather on the fact that there were houses along the road. In excluding the testimony, the trial court stated the following:

> I think my problem with this questioning is, originally, the way the questions were asked were, is this a residence district, and obviously that has a specific meaning that he clearly had no idea what that was. . . . My problem is, that that whole conversation was precipitated by an attempt to try to get him to qualify it under the statute, and that's when you said, "Well, I say it's a residential area." You said, "It's a district." Then he said, "Well, yeah, it's a residential." He didn't, obviously, want to say that because he probably wasn't clear as to what that was, and so that whole conversation seems to – there will be nothing in front of that if you start with, "And why do you say it's a residential area."

We find no abuse of discretion by the trial court.

UPS further contends the trial court erred in excluding the following testimony of Megan McGehee, the resident of 109 Ranger Creek at the time of the accident. In particular, UPS complains that the following testimony was excluded:

Q: And it looks to me [looking at Googlemaps picture] – well, let me ask you, are there a number of structures and driveways along Ranger Creek Road around where your house is located?

A: There [are] neighbors, yeah.

Q: And are those residences – are those – when you say neighbors, do you mean residences where people and families live?

A: Yes. There [are] families on both sides.

Rankin argues that the trial court's exclusion of this testimony was harmless because Sergeant Allison testified there are other residences on either side of 109 Ranger Creek Road. Further, the Googlemaps Exhibit 93A clearly showed homes on either side of 109 Ranger Creek Road. Indeed, whether there were homes on either side of 109 Ranger Creek Road was not a disputed fact at trial.

What was disputed at trial was whether 300 feet of highway frontage was primarily improved with residences. Thus, the trial court did not abuse its discretion in excluding the testimony.

### D. Judicial Admission

UPS also argues that at closing argument, Rankin's counsel made a judicial admission that the UPS car was in motion, and not parked, at the time of the accident. Assertions of fact, not pleaded in the alternative, in the live pleadings of a party are regarded as formal judicial admissions. *Holy Cross Church of God in Christ v. Wolf*, 44 S.W.3d 562, 568 (Tex. 2001). "A judicially admitted fact is established as a matter of law, and the admitting party may not dispute it or introduce evidence contrary to it." *In re Spooner*, 333 S.W.3d 759, 764 (Tex. App.—Houston [1st Dist.] 2010, orig. proceeding). "This rule is based on the public policy that it would be absurd and manifestly unjust to permit a party to recover after he has sworn himself out of court by a clear and unequivocal statement." *Id.* "Nonetheless, a judicial admission must be clear, deliberate, and unequivocal." *Id.* (citing *Regency Advantage Ltd. P'ship v. Bingo Idea–Watauga, Inc.*, 936 S.W.2d 275, 278 (Tex. 1996)). Rankin argues that when his attorney's argument to the jury is read in context, he was not judicially admitting that the UPS car was in motion at the time of the accident. We agree with Rankin and hold there was no judicial admission of the UPS vehicle being in motion at the time of the accident.

### CROSS-APPEAL ATTORNEYS' FEES

Rankin brings a cross appeal, arguing that the trial court erred by failing to include in its calculations of attorneys' fees awarded to Rankin a multiplier of the lodestar calculation. Rankin also argues that the trial court erred in failing to award him conditional appellate attorneys' fees.

Pursuant to section 42.004 of the Texas Civil Practice and Remedies Code, if a settlement offer is made and rejected, and the judgment rendered is significantly less favorable to the rejecting party than was the settlement offer, the offering party shall recover litigation costs from the

rejecting party. TEX. CIV. PRAC. & REM. CODE ANN. § 42.004(a) (West 2015). Here, Rankin made an offer of settlement, which was rejected by UPS. The final judgment was significantly less favorable to UPS than Rankin's offer of settlement. Thus, pursuant to section 42.004(a), Rankin is entitled to recover "litigation costs" from UPS that Rankin incurred after the date UPS rejected the settlement offer. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 42.004(a) (West 2015).

"Litigation costs" include reasonable attorneys' fees. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 42.001(5)(D) (West 2015). Here, the final judgment included an award of $685,620.50 in attorneys' fees. Rankin claims the trial court should have used a multiplier and awarded more attorneys' fees than $685,620.50.

The award of attorney's fees generally rests in the sound discretion of the trial court. *El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 761 (Tex. 2012). Rankin argues the trial court abused its discretion because "Texas law required the trial court to award to the Rankins as their attorneys' fees a multiplier of the lodestar calculation." According to Rankin, "[t]he novelty and difficulty of the issues involved, the contingent nature of the fee arrangement between [him] and [his] counsel, the amount involved and the result obtained, the fee customarily charged for services such as these (*i.e.* a contingent fee), and the ability and experience of [his] counsel all compel that result." He requests that we "determine that the trial court erred and abused its discretion and that [he] should have received a lodestar multiplier of two-and-one-half times *as a matter of law* and should reverse the trial court's award of attorney's fees and render judgment that [he is] awarded $1,714,051.25 in attorneys' fees."

In support of this argument, Rankin states that "[a]n appellant recently asked the Texas Supreme Court to expressly reject the contingent nature of a fee as a basis for application of a lodestar multiplier, and the Court refused to do so." Rankin is referring to *El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757 (Tex. 2012), where an Applebee's restaurant manager won a sex discrimination

suit and was awarded attorneys' fees. The trial court used the lodestar method to calculate attorney's fees. *Id.* at 759. It then enhanced the lodestar by applying a 2.0 multiplier, resulting in $464,000 in attorney's fees for the trial of the case. *Id.* On appeal, the defendant argued that the trial court abused its discretion because no basis existed for the trial court's enhancement of the lodestar. *Id.* at 759-60. The supreme court explained that "[u]nder the lodestar method, the determination of what constitutes a reasonable attorney's fee involves two steps." *Id.* at 760. "First, the court must determine the reasonable hours spent by counsel in the case and a reasonable hourly rate for such work." *Id.* "The court then multiplies the number of such hours by the applicable rate, the product of which is the base fee or lodestar." *Id.* "The court may then adjust the base lodestar up or down (apply a multiplier), if relevant factors indicate an adjustment is necessary to reach a reasonable fee in the case." *Id.* The court explained that the "lodestar method aims to provide a relatively objective measure of attorney's fees." *Id.* at 762. "The starting point for determining a lodestar fee award is the number of hours 'reasonably expended on the litigation.'" *Id.* "The party applying for the award bears the burden of proof." *Id.* at 762-63. "That proof should include the basic facts underlying the lodestar, which are (1) the nature of the work, (2) who performed the services and their rate; (3) approximately when the services where performed, and (4) the number of hours worked." *Id.* at 763. The court also emphasized that an appellate court should "accord considerable deference to a trial court's findings regarding whether prevailing counsel's claimed hours are excessive, redundant, or unreasonable." *Id.* at 763-64. "The trial court possesses a superior understanding of the case and the factual matters involved." *Id.* at 764.

With regard to the multiplier, the supreme court in *El Apple I* recognized that the lodestar is presumptively a reasonable fee and that enhancements should be rare and reserved for exceptional cases. *Id.* The defendant criticized the trial court for basing its decision to apply a multiplier solely on the contingent nature of the fee and not any exceptional aspect of the case. *Id.*

The supreme court explained that it "accept[ed] the premise that lodestar presumptively produces a reasonable fee, but that exceptional circumstances may justify enhancements to the base lodestar." *Id.* at 765. According to the court, "[w]hether a multiplier is needed, however, cannot be determined until the base lodestar is known." *Id.* Because the court did "not as yet have a legitimate base lodestar in this case, any comment on the need for a multiplier here is premature."

Thus, pursuant to *El Apple*, the trial court has much discretion in determining the amount of fees and whether to apply a multiplier. *El Apple* does not stand for the proposition that the trial court *must* use a multiplier. Further, as pointed out by UPS, no Texas appellate court has ever approved the use of a multiplier in awarding attorneys' fees in the context of "litigation costs" in chapter 42 of the Texas Civil Practice and Remedies Code. We therefore find no abuse of discretion by the trial court in failing to apply a multiplier.

Rankin additionally argues the trial court erred by failing to award him conditional appellate attorneys' fees. As noted, pursuant to Texas Rule of Civil Procedure 167.4(a), "[i]f a settlement offer made under this rule is rejected, and the judgment to be awarded on the monetary claims covered by the offer is significantly less favorable to the offeree than was the offer, *the court must award* the offeror litigation costs against the offeree *from the time the offer was rejected to the time of judgment*." TEX. R. CIV. P. 167.4(a) (emphasis added). Rankin argues that "to the time of judgment" includes the time until an appellate judgment is signed and thus the trial court abused its discretion by failing to award him conditional appellate attorneys' fees. UPS responds that the trial court correctly interpreted "to the time of judgment" to mean to the time the trial court's judgment was signed. We agree with UPS. Based on the language of Rule 167 as a whole, we conclude the trial court did not abuse its discretion by failing to award conditional appellate attorneys' fees.

**CONCLUSION**

Because there is legally and factually sufficient evidence to support the jury's findings of proximate cause and proportionate responsibility, the judgment of the trial court is affirmed based on the jury's finding of common-law negligence. Alternatively, even if the judgment could not be affirmed based on the jury's common-law negligence finding, we hold that (1) there is legally and factually sufficient evidence to support the jury's negligence per se finding; (2) the trial court did not err in submitting Question 1 to the jury; (3) the trial court's admission of certain evidence relating to Rankin's negligence per se claim was not error or constituted harmless error; and (4) there was no judicial admission made by Rankin. Finally, we hold the trial court did not abuse its discretion in failing to include in its calculations of attorneys' fees awarded to Rankin a multiplier of the lodestar calculation, nor did the trial court abuse its discretion in failing to award conditional appellate fees. The judgment of the trial court is affirmed.


Karen Angelini, Justice