

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-24-00284-CV

Sandra Karena **ELIZONDO**,
Appellant

v.

Lee **REYNA**,
Appellee

From the 49th Judicial District Court, Webb County, Texas
Trial Court No. 2021CVA000344D1
Honorable Jose A. Lopez, Judge Presiding

Opinion by:    Lori I. Valenzuela, Justice

Sitting:    Lori I. Valenzuela, Justice
Lori Massey Brissette, Justice
H. Todd McCray, Justice

Delivered and Filed: August 27, 2025

AFFIRMED

In three issues, appellant Sandra Karena Elizondo challenges a judgment rendered in favor

of appellee Lee Reyna after a jury trial. We affirm the trial court's judgment.

## BACKGROUND

Reyna sued Elizondo after a May 2019 automobile collision. The parties presented Reyna's

claims to a Webb County jury in October of 2023.

Reyna is a former National Guard member, and he was on duty at the time of the collision.

Reyna and two of his passengers, fellow Guardsmen Joseph Contreras and Mitchell Guile, testified that Elizondo t-boned their 15-passenger van and that the force of the impact pushed the van over a curb. Reyna, Contreras, Guile, and Elizondo all testified that they were transported to the hospital by ambulance after the collision.

Reyna testified that at the moment of impact, he "felt a pop" in his right shoulder and "felt a liquid—a warm fluid on [his] right shoulder, inside [his] shoulder." He reported shoulder, neck, and back pain at the scene of the collision and when he arrived at the hospital. He further testified that the injuries he suffered in the collision forced him to retire from the National Guard several years sooner than he intended because he could no longer complete the required physical training ("PT") tests.

Reyna presented evidence from three of his treating healthcare providers—physical therapist Troy Turner, nurse practitioner Mario Salinas, and orthopedic surgeon Ramon Soriano—who testified that Reyna suffered shoulder, neck, and back injuries in the collision, including a full-thickness rotator cuff tear, and that his rotator cuff injury required surgical repair. The jury also heard testimony from Reyna's wife, Estephanie Ramos; Officer Reynaldo Prado, who responded to the collision; an automotive technician, Peter Sullivan, who testified during Reyna's case-in-chief about alleged defects in Elizondo's vehicle; a biomechanical engineer, Adelino Yung, who testified during Elizondo's case-in-chief about the forces created by the collision; and a diagnostic radiologist, Alvaro J. Ramos, who testified during Elizondo's case-in-chief about his review of Reyna's radiological exams and his disagreement with Reyna's treating providers' diagnosis of a rotator cuff tear.

After considering the evidence, the jury found that Elizondo's negligence proximately caused the collision. It awarded Reyna $13,541.67 for past physical pain; $27,083.34 for future

physical pain; $6,000 for past mental anguish; $12,000 for future mental anguish; $48,000 for loss of earning capacity in the past; $500 for past disfigurement; $13,541.61 for past physical impairment; $32,000 for future physical impairment; $32,660.93 for past medical expenses; and $16,000 for future medical expenses. The trial court signed a judgment consistent with the jury's verdict. After the trial court denied her post-trial motions, Elizondo timely filed this appeal.

## ANALYSIS

### Sufficiency of the Evidence

In her first issue, Elizondo argues the evidence was legally and factually insufficient to support the judgment's award of past and future medical expenses. In her second issue, she claims the evidence was legally and factually insufficient to support the judgment's award of past and future mental anguish.

### Standard of Review

When an appellant challenges the legal sufficiency of the evidence supporting an adverse finding on which she did not bear the burden of proof, she must establish that no evidence supports the finding. *See In re Marriage of Thrash*, 605 S.W.3d 224, 230 (Tex. App.—San Antonio 2020, pet. denied). We credit the evidence that supports the challenged finding if a reasonable factfinder could, and disregard contrary evidence unless a reasonable factfinder could not. *See Graham Cent. Station, Inc. v. Pena*, 442 S.W.3d 261, 263 (Tex. 2014) (per curiam). If more than a scintilla of evidence supports the finding, the legal sufficiency challenge must fail. *See Tex. Outfitters Ltd., LLC v. Nicholson*, 572 S.W.3d 647, 653 (Tex. 2019).

In a factual sufficiency review, we consider the entire record, including evidence contrary to the challenged finding. *See Vast Constr., LLC v. CTC Contractors, LLC*, 526 S.W.3d 709, 723 (Tex. App.—Houston [14th Dist.] 2017, no pet.). To prevail on a claim of factual insufficiency,

the appellant must show the challenged finding is so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Abrams v. Salinas*, 467 S.W.3d 606, 614 (Tex. App.—San Antonio 2015, no pet.).

"In either a legal or factual sufficiency review, issues of credibility and reconciling conflicts within the evidence are for the jury." *4922 Holdings, LLC v. Rivera*, 625 S.W.3d 316, 328 (Tex. App.—Houston [14th Dist.] 2021, pet. denied). We may not substitute our own judgment for the jury's, even if the evidence would support a different result. *See United Parcel Serv., Inc. v. Rankin*, 468 S.W.3d 609, 615 (Tex. App.—San Antonio 2015, pet. denied).

*Past and Future Medical Expenses*

1.      Applicable Law

"'[A]t trial the plaintiff must establish two causal nexuses in order to be entitled to recovery: (a) a causal nexus between the defendant's conduct and the event sued upon; and (b) a causal nexus between the event sued upon and the plaintiff's injuries.'" *Jelinek v. Casas*, 328 S.W.3d 526, 532 (Tex. 2010) (quoting *Morgan v. Compugraphic Corp.*, 675 S.W.2d 729, 731 (Tex. 1984)). Elizondo has not challenged the jury's finding that her negligence proximately caused the collision. Instead, she argues only that the evidence presented at trial was insufficient to show that the collision caused Reyna's past and future medical expenses.[1] As a result, "[o]nly the second nexus is at issue here." *Id.*

When a plaintiff seeks to recover medical expenses, "expert medical evidence is required to prove causation unless competent evidence supports a finding that the conditions in question, the causal relationship between the conditions and the accident, and the necessity of the particular

---

[1] Elizondo has not explicitly argued that the evidence does not support the jury's findings that the collision caused Reyna's past and future physical pain, past loss of earning capacity, past disfigurement, and past and future physical impairment. She also has not challenged the reasonableness of Reyna's medical bills.

medical treatments for the conditions are within the common knowledge and experience of laypersons." *Guevara v. Ferrer*, 247 S.W.3d 662, 663 (Tex. 2007). "It is not enough for an expert simply to opine that the defendant's negligence caused the plaintiff's injury. The expert must also, to a reasonable degree of medical probability, explain how and why the negligence caused the injury." *Jelinek*, 328 S.W.3d at 536. "If no basis for the opinion is offered, or the basis offered provides no support, the opinion is merely a conclusory statement and cannot be considered probative evidence, regardless of whether there is no objection." *Bustamante v. Ponte*, 529 S.W.3d 447, 462 (Tex. 2017).

2.     Application

As a threshold matter, we note that the Texas Supreme Court has previously held that "[n]on-expert evidence of circumstances surrounding the accident and [the plaintiff's] complaints is sufficient to allow a layperson of common knowledge and experience to determine that [the plaintiff's] immediate post-accident condition which resulted in his being transported to an emergency room and examined in the emergency room were causally related to the accident. Thus, the evidence is legally sufficient to support a finding that some of his medical expenses were causally related to the accident." *Guevara*, 247 S.W.3d at 669. The same is true here. As noted above, Reyna, his passengers, and Elizondo all testified that they were transported to the hospital by ambulance after the collision. At a bare minimum, this testimony was sufficient to allow a layperson to determine that Reyna's ambulance and emergency room bills were caused by the collision. *See id.* We therefore cannot say the record is devoid of *any* evidence establishing a causal connection between the collision and at least some of Reyna's medical expenses.

Elizondo cites authority holding that the shoulder, neck, and back injuries about which Reyna complained "are neither common nor basic" and are thus generally outside the knowledge

of laypersons. *See, e.g.*, *Lara v. Bui*, No. 01-21-00484-CV, 2023 WL 2249205, at *4–7 (Tex. App.—Houston [1st Dist.] Feb. 28, 2023, pet. denied) (mem. op.); *Hills v. Donis*, No. 14-18-00566-CV, 2021 WL 507306, at *4 (Tex. App.—Houston [14th Dist.] Feb. 11, 2021, pet. denied) (mem. op.); *Sanchez v. Leija*, No. 01-19-00165-CV, 2020 WL 7349094, at *3 (Tex. App.—Houston [1st Dist.] Dec. 15, 2020, no pet.) (mem. op.); *but see Sw. Bell Tel., L.P. v. Valadez*, No. 02-07-00129-CV, 2008 WL 425746, at *3 (Tex. App.—Fort Worth Feb. 14, 2008, no pet.) (mem. op.) (affirming damages related to torn rotator cuff based on lay testimony from the injured plaintiff). Elizondo argues that Reyna did not present legally or factually sufficient evidence to support his past and future medical expenses because his three treating providers "summarily agreed" that the accident caused Reyna's injuries and offered nothing more than "bare, conclusory testimony" to support those opinions.

In *Lara*, a case upon which Elizondo heavily relies, the plaintiff presented his treating physician's testimony that the treatment she provided was medically necessary. *Lara*, 2023 WL 2249205, at *2–3. However, the physician did not testify that the plaintiff's injuries were caused by the subject accident. *Id.* at *5. While medical records admitted into evidence contained a single note that the plaintiff's injuries were caused by the accident, there was no expert medical evidence in the record to support that conclusion. *Id.* at *7. On that record, the First Court of Appeals concluded the evidence was legally insufficient to support an award of medical expenses. *Id.* at *7–8. For the reasons explained below, we conclude this case is distinguishable from *Lara*.

Reyna testified multiple times that he felt a popping sensation in his shoulder at the moment of impact. Temporal proximity alone, without supporting expert evidence, is generally insufficient to support an inference of medical causation. *Id.* at *5; *Sanchez*, 2020 WL 7349094, at *3. Here, however, Reyna's orthopedic surgeon, Soriano, testified that "it could be possible" that the

sensation Reyna described would result from a tearing rotator cuff. Additionally, Reyna's testimony that he felt the pop contemporaneously with the impact "highlights a connection between two events that is apparent to a casual observer." *See Jelinek*, 328 S.W.3d at 533.

In addition to his testimony about the popping sensation, Reyna testified that before the collision, he never had any trouble with arm or shoulder movements, carrying his daughter, or doing push-ups, but those activities caused pain after the collision. The Fort Worth Court of Appeals has held that similar lay testimony was sufficient to establish a causal connection between a defendant's negligence and a plaintiff's torn rotator cuff. *See Valadez*, 2008 WL 425746, at *3–4. In that case, plaintiff Valadez fell into a hole in his backyard that had been dug by the defendant, SWBT. *Id.* at *1. Valadez was knocked unconscious in the fall, and he testified that when he came to, he "immediately felt pain in his left shoulder." *Id.* at *1, *4. Both Valadez and his wife "testified that prior to the fall he had normal, painless use of his left shoulder and that after the fall he experienced pain in his left shoulder and needed surgery on it." *Id.* at *4. Based on that testimony, the appellate court affirmed the jury's award of past medical expenses related to Valadez's torn rotator cuff, including the surgical repair of the rotator cuff, because:

> the causal connection here between the event—Valade[z] falling into the hole in his backyard that jury found was negligently made and left unfilled by SWBT—and the immediate pain in his left shoulder—for which he sought treatment, evaluation, and X-rays the day of the fall—is within a layperson's general experience and common sense.

*Id.*; *see also Hills*, 2021 WL 507306, at *5 (holding that plaintiff's "description of the accident . . . including the temporal proximity between the accident and the injuries" to her ankle was sufficient to establish causal connection between collision and the ankle injury); *cf. Lara*, 2023 WL 2249205, at *6 ("There is no evidence that [the plaintiff in *Lara*] sustained overt injuries such

as broken bones or lacerations, or that he experienced objective physical symptoms shortly after the accident.").

Furthermore, Elizondo's own medical expert testified that an acute shoulder injury could result in joint effusion, or fluid in the joint. Reyna testified that he felt "a warm fluid on my right shoulder, inside my shoulder" at the moment of impact, and his MRI report showed "a mild joint effusion" in "[t]he glenohumeral joint" as well as "[f]luid in the subdeltoid bursa." Like Reyna's description of a popping sensation at the moment of impact, this evidence supports a conclusion that Reyna experienced "objective physical symptoms shortly after the accident" that were consistent with his eventual diagnoses. *Cf. Lara*, 2023 WL 2249205, at *6.

Physical therapist Turner testified that he treated Reyna for neck, back, and right shoulder injuries beginning on July 5, 2019, which was approximately two months after the May 2019 collision. He had treated patients who had been involved in auto accidents "[m]ultiple times" in his 30-year career, and he explained that auto accidents are a known mechanism for neck, back, and shoulder injuries. He testified:

> Our muscles support our spine. So when any kind of vehicle accident causes a force, it can be forward, it can be lateral, it can be backward, depending on where the vehicles hit. The muscles, tendons, ligaments that are supporting the head, and neck, and spine, can be strained, injured, or even ruptured. . . . The same type of forces as go in the neck can be on the back also. Think about if you're restrained with a seat belt, part of it can be held, part of your back can move. You can have forward injuries of muscles, spine; side to side, backwards injuries. Because as— as your body's moving, and a different force hits, you're going to go with that force, and then the body is going to retract the opposite way for the balance of the muscles and the spine.

Both Reyna and his passengers testified that they experienced the kind of forces Turner described in this collision. Guile described "being bounced around and rattled," and Reyna described having a "death grip" on the steering wheel because he was afraid "we were gonna either flip or go—keep on going over the curb[.]"

Turner testified that as a physical therapist, he has the education, training, and experience necessary to perform an assessment and differential diagnosis to determine the cause of his patients' neck, back, and shoulder problems. To make his diagnoses, he "start[s] with subjective, so what the patient explained how the accident happened, or the mechanism of injury." In this case, Reyna's initial subjective report to Turner was that he had neck and low back pain after being involved in a "t-bone" collision. Turner explained that after taking the patient's subjective report, "[t]hen objectively we measure. We measure motion. We measure strength. We look at sensation. We palpate, meaning touch the area. Does it hurt to touch. And then we form our assessment of decreased motion, level of pain, decreased strength, or not." Turner also reviewed a report of an x-ray that was performed on Reyna a few days after the collision and noted that it showed "'straightening the spine; compatible with muscle spasm.'" He testified that there is no way for a patient to fake a muscle spasm on an x-ray.

Turner testified that in October 2019, after 26 sessions of post-collision physical therapy, Reyna "still complained of severe intensity of the pain on the right shoulder, and he had moderate difficulty with lifting his right shoulder overhead." When asked what kind of injury could cause a patient to have difficulty raising his shoulder, Turner responded, "The rotator cuff. . . . A strain in the shoulder." An October 9, 2019 MRI showed Reyna had "a full thickness tear of the distal supraspinatus tendon [rotator cuff]." Turner testified that physical therapy cannot fix a full-thickness rotator cuff tear and that the tear thus explained why Reyna's symptoms persisted. Turner concluded that the medical treatment, including the surgery, provided to Reyna was reasonable and necessary as a result of the May 2019 collision because "before the accident [Reyna] stated he had no problems, it was the accident that caused the injuries." He specified that his opinion

regarding the cause of Reyna's torn rotator cuff "comes from a medical document of the MRI report."

Reyna's nurse practitioner, Salinas, testified that he had experience treating patients who had been in auto accidents, including patients who had suffered neck, back, and shoulder injuries in those accidents. As a nurse practitioner, Salinas has the ability to diagnose a patient's problems, order diagnostic testing, and develop a treatment plan. When Reyna first presented at Salinas's clinic in October 2019, he "reported having been in a motor vehicle accident [on] May 17th that year, 2019, stating he had already received some physical therapy for about two months and stopped a day prior to coming in to see [Salinas]. And he was complaining of pain to the right shoulder." Salinas noted that EMS records showed Reyna complained of "[b]ack pain and shoulder pain" immediately after the collision and that he had a decreased range of motion in his shoulder when Salinas examined him. Salinas explained that because Reyna's MRI did not show any atrophy in his shoulder muscles or retraction of the tendon, "to me it indicates that it's a fairly new tear." Based on his examination of Reyna and Reyna's medical records, Salinas "referred [Reyna] to ortho surgeon, Dr. Soriano, and [told Reyna] to continue avoiding push-ups for now and to continue with physical therapy as well."

By July and August 2020, Salinas's notes indicated that Reyna's condition "was permanent, because it's a chronic condition already." Salinas believed Reyna's condition "wasn't gonna change in the future, and that he may still have limitations, even after recovering with therapy and all of that." *See Simpson v. Garcia*, No. 04-23-00012-CV, 2024 WL 104285, at *4–5 (Tex. App.—San Antonio Jan. 10, 2024, no pet.) (mem. op.) (affirming award of future medical expenses based on similar medical testimony). Like Turner, Salinas noted that Reyna "said that that pain all started after the motor vehicle accident in 2019." After explaining how he assessed,

diagnosed, and treated Reyna's injuries, Salinas testified that he believed the 2019 collision caused those injuries.

Like Salinas, Soriano noted that Reyna complained of back and shoulder pain at the scene of the collision. Soriano testified that taking a patient's history is "very important, because this is how you rely on, you know, the mechanism of injury, what happened, what were his surrounding circumstances. You always start off with, you know, a good history[.]" When Soriano took Reyna's history, he noted that Reyna "came in complaining of pain in his right shoulder after he was involved in a car accident after he—he was a driver hit on the passenger side, which was—he described to be t-boned, and he felt a pop in his shoulder." Soriano testified that after he examined Reyna and took his history, he believed "the impact from the—from the hit from the other vehicle potentially caused him to have this injury to his shoulder." He also testified that his history and exam did not reveal anything other than the May 2019 collision that could have caused Reyna's injuries. He used a model of the shoulder to explain to the jury why Reyna's rotator cuff injury looked different than a "more chronic" or pre-existing tear, and he testified that if Reyna's injury had occurred before the May 2019 collision, he would have expected to see "a larger tear of the tendon." Finally, he explained that surgery was appropriate to repair Reyna's rotator cuff "because he had been treated already since May. It was several months already that he had been undergoing a supervised course of physical therapy, and he was not getting any better."

The evidence described above is neither as deficient as the evidence the Texas Supreme Court rejected as insufficient in *Jelinek* and *Guevara* nor as detailed as the evidence the court concluded was sufficient in *Bustamante*. *See generally Bustamante*, 529 S.W.3d at 458–72; *Jelinek*, 328 S.W.3d at 532–38; *Guevara*, 247 S.W.3d at 667–70. However, after reviewing the evidence in the light most favorable to the judgment, we hold it amounts to more than the mere

*ipse dixit* of Reyna's treating healthcare providers that the May 2019 collision caused Reyna to incur past medical expenses and would, in all reasonable probability, cause him to incur medical expenses in the future. *See Valadez*, 2008 WL 425746, at *3; *see also Sheppard v. Martinez*, No. 14-23-00473-CV, 2025 WL 630215, at *3–4 (Tex. App.—Houston [14th Dist.] Feb. 27, 2025, no pet.) (mem. op.) (rejecting defendant's claim that expert medical evidence was conclusory because that argument focused on segments of testimony "in isolation"). The record contains both lay and expert testimony that Reyna exhibited physical symptoms that appeared at the moment of the collision, that those symptoms were consistent with his eventual diagnoses, and that the medical treatment he received in the past and expected to receive in the future was reasonable and necessary to treat those diagnoses. Furthermore, as explained above, Turner specifically testified about how forces generated by an auto collision cause injury in the human body, thus explaining "how and why" the collision in this case caused Reyna's injuries. *See Jelinek*, 328 S.W.3d at 536; *cf. Simpson*, 2024 WL104285, at *2 (rejecting a defendant's claim that medical testimony was too general or indefinite to be admissible evidence of plaintiff's future medical expenses).

Elizondo also argues that "the evidence shows [Reyna's] injuries may be less serious than claimed by his experts and/or possibly caused by a prior accident or unrelated degeneration." She notes that the evidence shows Reyna was involved in a previous auto collision that also injured his back, shoulder, and neck. "When circumstantial evidence is consistent with several possible medical conclusions, only one of which establishes that the defendant's negligence caused the plaintiff's injury, an expert witness must explain why, based on the particular facts of the case, that conclusion is medically superior to the others." *Jelinek*, 328 S.W.3d at 529.

Reyna testified that during the previous accident, which occurred in April 2018, he did not feel any of the popping or tearing sensations he experienced in this collision. He reported that he

received one injection and some physical therapy after that accident, that the injection alleviated his pain, and that no doctor ever placed restrictions on the use of his shoulder after that accident. He also testified the injuries he experienced in the previous collision fully resolved within "seven to eight months" and that by October 2018 he was able to complete and pass a full, unmodified PT test. But in 2019, after the collision at issue here, he could only pass a PT test that was modified to accommodate his injuries, and by 2020, the pain in his shoulder, lower back, and neck prevented him from passing even a modified PT test. And, as noted above, Salinas and Soriano both testified that Reyna's torn rotator cuff appeared to be recent because his October 2019 MRI did not show the muscle atrophy or tendon retraction they would have expected to see in a chronic or pre-existing injury. Based on this evidence, a rational jury could have found that the previous collision did not cause the injuries Reyna complained of in this case.

Turner testified that the bodies of most people Reyna's age have some level of degeneration in the neck, spine, and shoulders. He also testified that in the vast majority of people, natural degeneration is asymptomatic and does not cause any pain; that previously asymptomatic degeneration can become painful if the person is exposed to trauma; and that normal degeneration makes a person more susceptible to injury by trauma because "[a]s disc[s], joints, muscles are weakened, then any kind of injury can make it worse." Salinas agreed that normal degeneration "can definitely make it worse from trauma." Based on this testimony, the jury could have reasonably found that evidence of degeneration in Reyna's body was not inconsistent with a finding that his injuries were causally linked to the accident.

For these reasons, we conclude the evidence is both legally and factually sufficient to support the judgment as to Reyna's past and future medical expenses. *See Valadez*, 2008 WL 425746, at *3. We overrule Elizondo's first issue.

*Mental Anguish*

Compensable mental anguish "implies a relatively high degree of mental pain and distress. It is more than mere disappointment, anger, resentment or embarrassment, although it may include all of these." *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995) (citation omitted). A plaintiff must present "evidence of the nature, duration, and severity of [his] mental anguish . . . to establish the existence of mental anguish damages." *Gregory v. Chohan*, 670 S.W.3d 546, 554 (Tex. 2023) (plurality op.); *Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 231 (Tex. 2011). If the plaintiff establishes the existence of compensable mental anguish, "[t]here must also be some evidence to justify the amount awarded." *Saenz v. Fid. & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996). "There must be evidence that the amount found is fair and reasonable compensation, just as there must be evidence to support any other jury finding." *Bentley v. Bunton*, 94 S.W.3d 561, 606 (Tex. 2002) (quoting *Saenz*, 925 S.W.2d at 614). "In short, '[j]uries cannot simply pick a number and put it in the blank.'" *Gregory*, 670 S.W.3d at 554 (quoting *Saenz*, 925 S.W.2d at 614).

Elizondo contends that Reyna's evidence of the nature, duration, and severity of his mental anguish was insufficient because "the only testimony as to the existence of mental anguish were short statements with little to no elaboration, such as that he felt 'anxiety' and that not sleeping in the same room as his wife 'hurts [him]' and 'has created some tension." Elizondo also argues that Reyna "produced *zero* evidence establishing the amount of his mental anguish damages."

We disagree with Elizondo's characterization of the evidence. Reyna testified that his physical pain causes him to "lose [his] sleep, because the anxiety level kicks in because of [his] pain." *See Boxer Prop. Mgmt. Corp. v. Dehnel*, No. 02-22-00336-CV, 2024 WL 3282541, at *29 (Tex. App.—Fort Worth July 3, 2024, pet. denied) (mem. op.) ("[R]ecovery is warranted when the

plaintiff's mental pain has risen to such a level that it has rendered her incapable of dealing with certain everyday activities like eating, sleeping, working, and socially interacting."). Reyna explained to the jury that because of his disrupted sleep, he and his wife "can't sleep in the same bed. I keep waking her up. And that leads to arguments." He testified that this "hurts [him]" because:

> Besides not being able to sleep with my pain, I can't be with my wife. . . . Sleeping in a different room has created some tension and some—some emotional distress with me. That's something that I can't even hug my wife for a long time at night like I used to . . . I would hug my wife at night, and we would fall asleep together.

Elizondo's brief suggests that the testimony described above was the extent of Reyna's evidence about the nature, duration, and severity of his mental anguish. The record does not support that suggestion. Reyna testified that he can no longer participate in activities he and his 10-year-old daughter used to enjoy together, such as riding roller coasters and kayaking, because he is afraid his physical limitations would prevent him from saving her in the event of an emergency. He also testified that he used to lift his daughter up "every day" but can no longer do so due to his injuries. He told the jury, "After that, my daughter said if I didn't love her anymore because I didn't—I didn't carry her. And I think that—that destroyed me more than—than anything else. I couldn't lift [her] up anymore." *See Anderson v. Durant*, 550 S.W.3d 605, 620 (Tex. 2018) (evidence that plaintiff's "wife and daughter noticed an alteration in his demeanor and treated him differently in response" was some evidence of compensable mental anguish).

Reyna further testified that he was "humiliated" by his inability to complete National Guard PT tests and "devastated" when his injuries forced him to end his service after 18 years:

> Because I couldn't be with my brothers anymore. I call them my boys. I served with some of them in Iraq. And I knew I wasn't going to be able to be with them anymore. . . . That was my other family. And our plan was to all retire together. . . . Because we went together to Iraq, and we all said we were gonna finish together.

Reyna told the jury that he had intended to remain in the National Guard for 25 years and that his position was important to him because "[i]t's a status. It takes years and years to get there. You become the—the Colonel or the—the Captain's confidant. And so, you're held to a different standard. And you're respected amongst your brothers and sisters in the military." After he left the National Guard, he began drinking because "I didn't want to think about it. So I would just drink a lot. Like, depression hit me." *See Tex. Dep't of Transp. v. Flores*, 576 S.W.3d 782, 801 (Tex. App.—El Paso 2019, pet. denied) (affirming mental anguish award where plaintiff testified that "he was dedicated to his job and proud of his performance ratings and reviews" and that his termination was "devastating" and "had 'broken' him").

"A plaintiff's testimony alone can suffice to prove mental anguish, although corroborating evidence from a spouse or friend can be helpful in determining evidentiary sufficiency." *Boxer*, 2024 WL 3282541, at *29. Here, Reyna's wife, Estephanie, testified that after the crash, Reyna was "more anxious" while driving than he had previously been:

> We have gotten into fights because he drives really slow. He doesn't take the highways. He—he goes on back roads, or if someone honks, he gets scared. Sometimes our daughter has to get involved into the conversation or into the argument we're having, like if she was the—the referee. But, I mean, we can't even—or I can't even put music on the radio because he gets nervous.

*See Anderson*, 550 S.W.3d at 620. Estephanie also testified that Reyna was frustrated by his inability to take their daughter kayaking and that he was "depressed. . . . I can see it." She told the jury that after their daughter asked Reyna if he did not love her anymore, Estephanie found him crying in their bedroom. She testified that she had never seen him crying like that, "not even when his mom died."

The jury had the benefit of being able to observe both Reyna and Estephanie as they testified and thus had an opportunity to "determine [their] emotional demeanor, gain some insight

into the severity of [Reyna's] suffering, and determine [Reyna's and Estephanie's] credibility on the question of compensatory damages." *Boxer*, 2024 WL 3282541, at *32. Based on Reyna's and Estephanie's testimony, the jury could have rationally concluded that Reyna suffered mental pain and distress in the past that was more than mere worry, anxiety, vexation, or embarrassment. *See Anderson*, 550 S.W.3d at 619–20. Additionally, because the evidence showed that Reyna's mental anguish arose from still-lingering physical injuries, had not abated during the four years between the collision and the trial, and continued to affect his relationships with his wife and daughter, the jury could have rationally found that his anguish would continue in the future. *See Fifth Club, Inc. v. Ramirez*, 196 S.W.3d 788, 797–98 (Tex. 2006).

As support for her assertion that Reyna did not present evidence of the amount of his mental anguish damages, Elizondo primarily relies on *Gregory v. Chohan*. We note that *Gregory* "is a plurality opinion lacking precedential value[.]" *Kelly Custom Homes, LLC v. Hopper*, No. 14-23-00793-CV, 2024 WL 3765393, at *8–9 (Tex. App.—Houston [14th Dist.] Aug. 13, 2024, pet. denied) (mem. op.) (affirming an award of mental anguish damages after *Gregory*); *see also Gregory*, 670 S.W.3d at 570 (Devine, J., concurring) (explaining that "we will never see" the kind of objective value evidence advocated by the plurality opinion because mental anguish is "*impossible* to objectively quantify"). However, "[d]espite the split opinions [in *Gregory*], there was still some common ground." *Garza v. Escamilla*, 712 S.W.3d 718, 727 (Tex. App.—Houston [14th Dist.] 2025, no pet.). A majority of the *Gregory* court rejected what the plurality and Justice Devine's concurring opinion referred to as "unsubstantiated anchoring"—*i.e.*, tying the amount of mental anguish damages "to objects or values with no rational connection to the facts of the case." *Gregory*, 670 S.W.3d at 557–60 (plurality op.); *id.* at 569–70 (Devine, J., concurring). Additionally, both the plurality and Justice Devine's concurrence reiterated that a mental anguish

award "cannot be based on mere passion, prejudice, or improper motive," such as a desire to punish the tortfeasor. *Gregory*, 670 S.W.3d at 558 (plurality op.); *id.* at 569–70 (Devine, J., concurring).[2]

The arguments the supreme court identified as problematic in *Gregory* were not made in this case. Like the appellant in *Kelly Custom Homes*, Elizondo "does not contend that [Reyna's] counsel engaged in the type of irrelevant, 'unsubstantiated anchoring' that a majority of supreme court justices agreed in *Gregory* is impermissible." 2024 WL 3765393, at *9. Moreover, "we do not see any basis in the record for concluding that the mental anguish award was the result of passion, prejudice, or improper motives or measurements." *Id.*

Reyna testified that he was 50 years old at the time of trial, and he presented a table showing that he had a remaining life expectancy of between 32 and 32.9 years. During closing argument, Reyna's counsel suggested that as compensation for Reyna's past mental anguish and his past physical impairment, the jury should award him a combined total of $25 a day—an amount that the evidence showed was approximately one hour of his National Guard pay—multiplied by the 1,625 days between the date of the crash and the date of the closing argument. Reyna's counsel then suggested that the jury award Reyna a combined total of between $10 and $20 per day, multiplied by the 11,680 days of Reyna's remaining expected life span, to compensate him for his future mental anguish and future physical impairment.

Because much of Reyna's mental anguish testimony was tied to the loss of his military service, we cannot say that the $25 per day amount his counsel suggested during closing argument had "no rational connection to the facts of the case." *Gregory*, 670 S.W.3d at 557. The jury's awards of $6,000 in past mental anguish and $12,000 in future mental anguish amounted to

---

[2] In *Gregory*, four people died in a collision caused by a jackknifed 18-wheeler. *Gregory*, 670 S.W.3d at 550. During a discussion of mental anguish damages during closing argument, one of the claimants' attorneys referred to the values of "expensive paintings and military aircraft" and "urged the jury to give defendants their 'two cents worth' for every one of the 650 million miles that [the defendant's] trucks drove during the year of the accident." *Id.* at 558.

approximately $3.69 per day and $1.03 per day, respectively. When combined with the unchallenged accompanying awards of $13,541.61 in past physical impairment (approximately $8.33 per day) and $32,000 in future physical impairment (approximately $2.74 per day), those awards are roughly half the amount Reyna requested. *See Boxer*, 2024 WL 3282541, at *32 (jury awarded appellant multiple types of non-economic damages but appellee did "not specifically challenge or discuss" any non-economic damages other than mental anguish). After reviewing the evidence in the light most favorable to the judgment, we conclude those amounts are both reasonable and rationally connected to the evidence. *See Kelly Custom Homes*, 2024 WL 3765393, at *8. We note, moreover, that even post-*Gregory*, at least one of our sister courts has affirmed mental anguish verdicts that appeared to have been based on similar "per day" calculations. *See id.* at *8–9; *Garza*, 712 S.W.3d at 727–31.

We overrule Elizondo's second issue.

### *Remittitur*

In her third issue, Elizondo argues that we should suggest a remittitur. *See* TEX. R. APP. P. 46.3. Because we have concluded the evidence was factually sufficient to support the full amount of the challenged damages, there is no basis upon which to suggest a remittitur. *See Geis v. Colina Del Rio, LP*, 362 S.W.3d 100, 115 (Tex. App.—San Antonio 2011, pet. denied). We therefore overrule Elizondo's third issue.

### CONCLUSION

We affirm the trial court's judgment.

Lori I. Valenzuela, Justice